**FIRST NAT. BANK OF ST. ELMO, ILL., et al. v. UNITED STATES.**

**No. 10476.**

United States Court of Appeals Seventh Circuit.

Feb. 14, 1952.

Spaulding Glass, Chicago, Ill., Leigh M. Kagy, East St. Louis, Ill., Theodore R. Scott, Chicago, Ill., of counsel, for appellant.

Ellis N. Slack, Acting Asst. Atty. Gen., Hilbert P. Zarky, A. F. Prescott, Richard D. Harrison, Special Assts. to the Atty. Gen., William W. Hart, U. S. Atty., Danville, Ill., Ernest R. McHale, Asst. U. S. Atty., East St. Louis, Ill., for appellee.

Before MAJOR, Chief Judge, and KERNER and SWAIM, Circuit Judges.

KERNER, Circuit Judge.

Appellant sued to recover income and excess profits taxes alleged to have been wrongly assessed. The facts in the case were introduced entirely by stipulation which the court adopted in lieu of special findings, concluding therefrom that, with one minor exception, appellant was not entitled to recover the taxes involved.

Appellant is a bank which acquired an 80-acre tract of farm land at a mortgage

foreclosure sale in July, 1934. In August, 1936, its officers executed an oil and gas lease to one Good, acting for C. R. Bennett, reserving a ⅛ royalty interest in any oil or gas that might be produced from the tract; at the same time the bank conveyed ½ of the ⅛ royalty interest so reserved, by separate instrument, to Bennett. Prior to July 14, 1939, several producing wells had been drilled on the property. The oil produced therefrom was sold to Sohio Corporation until September, 1940, and thereafter to Cities Service Oil Company. Sohio paid the ⅛ royalty required by the lease, one half to the bank and the other half to Bennett, until July 1, 1939. From that date until December 10, 1941, royalty payments for all oil produced from the tract were impounded by Sohio and Cities Service pending determination of certain litigation over title to the property and the oil produced therefrom.

In February, 1939, appellant made inquiry of the Treasury Department, Office of the Comptroller of the Currency, as to its right as a bank to hold the real estate. It was then advised that under § 5137 U.S. R.S., 12 U.S.C.A. § 29, it would not be permitted to retain title and possession after expiration of the five-year period in December, 1940, at which time it might be necessary to transfer the title to trustees for the benefit of the bank's shareholders, or otherwise eliminate it from the bank's assets.

The litigation referred to above which furnished the reason for the impounding of all royalty payments until final settlement of all issues arising during its course was initiated by the filing of a suit on July 14, 1939, by the former owners of the tract to set aside the foreclosure decree. They joined the bank, Good, Bennett, and others as parties defendant. Before that suit was decided adversely to the plaintiffs therein, the bank filed a counterclaim in the same suit against Bennett "involving the lease, an overriding royalty interest and a ⅟₁₆ oil royalty interest mentioned above." The decree adjudicating the validity of the foreclosure proceedings and the bank's title to the land was affirmed in April, 1941, 376 Ill. 450, 34 N.E.2d 388, at which time the bank's counterclaim against Bennett was still pending. That matter came on for hearing on September 29, 1941, and a decree was then entered "conditioned upon the written contract of settlement of the same date, and the payment of $18,000 from C. R. Bennett to the Bank called for by the agreement." By the terms of this decree, upon payment of the amount agreed upon in the settlement agreement, one half of the oil and gas in place was confirmed in Bennett, and a mineral deed to Bennett mentioned in the counterclaim was confirmed as good and valid as to all rights therein granted, and the oil and gas lease mentioned in the counterclaim and its assignment to one Mabee were also confirmed as good and valid. The exact nature or theory of the counterclaim, except as it is said to involve the lease, the overriding royalty and a ⅟₁₆ oil royalty, is nowhere disclosed in this record.

The agreement on which the decree on the counterclaim was based provided that Bennett should execute whatever instruments were necessary for the payment by Sohio to the bank of $18,000 out of the moneys otherwise payable to Bennett "for overriding royalty for oil produced from the land described in said Counter-claim." It further provided that the bank should execute whatever instruments were necessary to enable Bennett to receive from any oil company that had received oil from the lands all moneys claimed by him under the mineral deed and oil leases after payment of the $18,000 to the bank, and for dismissal of the suit on the counterclaim upon ratification of the agreement by the Board of Directors of the bank.

On October 7, 1941, the Board met and passed a resolution contemplating the execution of certain instruments necessary to implement the agreement and, also to transfer to its shareholders certain of its rights and interests arising out of its ownership of the tract of land as dividends in kind. Pursuant to this resolution three instruments were executed: (1) a trust indenture between the bank and C. M. Koeberlein as trustee to receive and hold for the benefit of the bank's shareholders all its rights and interests in two properties

designated as "Property A" and "Property B"; (2) a mineral deed conveying and quitclaiming to the trustee all the bank's right, title and interest in the oil, gas and other minerals on, in and under, and which might be produced from the 80-acre tract, together with the right to receive all proceeds arising from any sale of such oil or gas subsequent to September 30, 1941, but specifically excluding any moneys then due to the bank from Sohio or Cities Service for any oil purchased by them and produced prior to October 1, 1941; and (3) an assignment by the bank to the trustee of all rights and benefits accruing from the settlement agreement between the bank and Bennett—referring, of course, to the $18,-000.

Thereafter the trustee executed and delivered to each of the bank's 48 shareholders of record on October 8, 1941, a separate mineral deed for his fractional share in the property conveyed to the trust by the mineral deed of October 8. November 6, 1941, Bennett executed a transfer order to Sohio transferring his overriding royalty interest in the oil produced on the tract after July 1, 1939, to the trustee, to remain in effect until the trustee had received the full amount agreed upon, after which the overriding royalty was to revert to Bennett. This order was received by Sohio on December 5, and it paid the $18,000 to the trustee five days later. December 18 the trustee distributed the $18,000 on a pro rata basis to the shareholders as of October 8, 1941.

Income taxes were duly returned and paid by each shareholder on his distributive share of the dividends in kind. The bank, which is on a cash receipts and disbursements basis, did not report receipt of the $18,000. The Commissioner assessed deficiencies as to this amount, and also as to $136 which represented royalties less depletion allowance for the first eight days in October, 1941, prior to transfer by the bank to the trustee of its interest in the royalties reserved by the oil and gas lease.

In holding that the bank realized taxable income through the settlement agreement and the eventual payment of the $18,000 in cash the trial judge observed, "The transaction appears to have been, in effect, a sale by the bank to C. R. Bennett of its property rights asserted in its counterclaim, though disputed by Bennett, in the oil property and royalties held by Bennett. The sale was consummated when the decree was entered pursuant to the terms of the agreement."

Appellant argues that under the cash basis method of accounting, a taxpayer entering into a contract providing for the payment to him of a sum of money realizes income, not at the time of execution of the contract, but at the time of receipt of the contract price. It points to a number of cases having to do with the question of when tax liability becomes fixed, as, for example, Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, a case involving the taxability of renewal commissions assigned by an insurance agent, which commissions, the Court said, were taxable as income of the assignor in the year when paid. But here there is no question raised as to the year when the tax liability became fixed—all the relevant events took place in the year 1941. The question here is not *when* or for what year the tax should be paid, but by whom it should be paid, and cases dealing with the *when* have no bearing on the issue. The significant fact is that the settlement agreement, confirmed by court decree, entitled the bank to receive a sum certain as soon as certain legal formalities were disposed of; the source from which that sum was to be paid was fixed, and there is no question but that that source was ample to cover it at the time it was specified. We think the bank could not, by transferring the right to collect this "sale price" to its shareholders, divest itself of liability for the taxes due thereon any more than could the insurance agent in the Eubank case, 311 U.S. 122, 61 S.Ct. 149, or the father making a gift of detached interest coupons not yet matured in Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, or the railroad directing its lessee to make all subsequent dividend payments directly to its shareholders in United States v. Joliet & Chicago Railroad Co., 315 U.S. 44, 62

S.Ct. 442, 86 L.Ed. 658. In all of these cases the transferor was held liable for the taxes on the sum transferred. See also Floyd v. Scofield, 5 Cir., 193 F.2d 594, involving facts similar in many respects to those here presented.

Appellant, relying on Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, contends that the instant case differs from the Supreme Court cases mentioned above, all of which, it says, merely involve anticipatory assignments of income, in that here, it unqualifiedly transferred all its right, title and interest in and to the property which produced the income, hence is not liable for taxes on income subsequently produced. As bearing on this proposition it asserts that under the terms of the agreement the $18,000 was to be paid out of moneys otherwise payable to Bennett for overriding royalty for oil produced from the land, and points out that Sohio would not pay this sum until it actually stood to Bennett's credit, and that there is no evidence of record to show that there was $18,000 available on October 7 with which to pay, and further, that a substantial part of the $18,000 may well have been the proceeds of oil produced between October 8, the date of the assignment, and December 10, the date Sohio actually paid the $18,000.

We note that, according to the stipulation, Sohio purchased oil produced on the tract until September, 1940, after which the oil was sold to Cities Service. Both companies impounded all royalties accruing after July 1, 1939. It would appear from this fact that the entire fund from which the $18,000 was directed to be paid by the transfer order of December 5 was derived from sales of oil produced from the land prior to September, 1940, and held by Sohio thereafter pending determination of the issues between the various parties. Thus the $18,000 must have been paid with the proceeds of oil already separated from the land prior to the order and, indeed, prior to the settlement. In this the case differs from the Blair case, 300 U.S. 5, 57 S.Ct. 330. We think this distinction was recognized by the parties in their choice of instruments to implement the transaction. The transfer to the bank's shareholders was accomplished by two separate and distinct instruments. One was the mineral deed which conveyed all the bank's interest in any minerals thereafter produced from the tract, referred to in the trust indenture as Property A, and the other was the assignment of the bank's rights arising out of the settlement agreement, referred to in the indenture as Property B. Thus the contemporaneous instruments recognized the separation of the two properties and the fact that the latter was a money claim, to be paid out of a fund elsewhere identified as having been created prior to September, 1940.

Appellant also argues that to assess taxes against it for income from property it was not permitted to retain is an inequity—that in transferring the land to a trustee for its shareholders it was merely carrying out the mandate of § 5137, and not trying to escape taxation, as the trial judge implied in comparing the case with Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, where the transaction was described as one, poorly disguised, to escape taxation. We think, however, that there is no need to look to motive—the fact is, the sale of the property had been accomplished by the bank before the assignment to the trustee for its stockholders, and all that remained was for the trustee to receive the sale price in cash and distribute it to them. In this connection we also note that so far as this record shows, the bank has not yet divested itself of its fee in the tract—we assume that the bank acquired the fee by the master's deed. However, the only deed of record on this appeal is the mineral deed quitclaiming all right, title and interest in the oil, gas and other minerals. That is what the resolution of October 7 authorized; that is what the mineral deed conveyed, and, so far as this record shows, that is the only conveyance from the bank.

With respect to the tax assessed for royalties said to have been earned during the first eight days of October, prior to the transfers, the bank denies liability on the ground that such royalties were not paid

to the trustee until the end of the month and there was no amount credited or set apart to the taxpayer which it could be said to have constructively received on October 8, after which date it had divested itself of all its interest in the income-producing property. Appellant cites no authority for this proposition, and we find no error in the action of the court in upholding the Commissioner's attributing of %₁ of the royalties for the month to the first eight days thereof.

Judgment affirmed.