**CUMMINS DIESEL SALES OF COLORADO CO., a co-partnership, and Lars O. Prestrud, as transferees of the assets of P–C Enterprises Co., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 66–C–210, 66–C–211.**

United States District Court
D. Colorado.

Feb. 3, 1967.

Holme, Roberts & Owen, Denver, Colo., for plaintiffs.

Lawrence M. Henry, U. S. Atty. for District of Colorado, Denver, Colo., David I. Shedroff, Asst. U. S. Atty., Denver, Colo., Mitchell Rogovin, Asst. Atty. Gen., Harold S. Larsen, Attorney, Department of Justice, Kenneth L. MacCardle, Attorney, Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

The consolidated cases before us are actions which seek the refund of federal income taxes of $136,318.56 together with interest amounting to $22,426.45, which sum was paid by the plaintiffs as transferees of the assets of P-C Enterprises Company, a dissolved Colorado corporation. The action stems from an assessment by the Commissioner of Internal Revenue which was made on April 1, 1965. The assessment was based on the ground that P-C should have recognized, in computing its taxable income for its taxable year ending March 31, 1962, $273,042.15 additional income derived from the construction and financing of a water system. The Commissioner of Internal Revenue timely assessed on April 1, 1965, $136,318.56 additional income tax, $22,426.45 interest against L. O. Prestrud and against J. B. Chambers, a general partner of Cummins Diesel Sales of Colorado Company. Cummins and Prestrud each paid the sum of $68,259.28 additional income tax, together with interest. Both Cummins and Prestrud timely filed on December 6, 1965, claims for refund of the entire amounts paid for both taxes assessed and interest. The claims for refund were disallowed on March 25, 1966, and the civil actions, numbered 210 and 211, are the result.

In order to understand the position of plaintiffs in relationship to the water system which is here involved, it is necessary to relate the history of the district and the events which led to the building of the water system by the plaintiffs. The North Washington Street Water and Sanitation District was formed in 1951. Its initial function was sanitation. The boundaries of the district at the time extended north from the city limits of Denver (Fifty-second Avenue) to approximately Seventieth Avenue.[1] It was bounded on the west by the Valley Highway and on the east by the Platte River. In 1951 the district employed the engineering firm of Ripple and Howe for the purpose of making a feasibility study looking to the building of a water system. This firm made a study and designed the system which was ultimately constructed. In the early years of the district, sanitation facilities were constructed and the funds for this were derived from a bond issue. When the time came to build the water system, the board of the district determined that it was not feasible to issue bonds for this purpose because there was not sufficient interest among the property owners of the district to ensure that they would approve such a bond issue in an election. For that reason private financing was suggested.

Neither of the plaintiffs was engaged in a business of building water plants. The regular occupation of both was the trucking or diesel motor business. The plight of the district came first to the attention of the plaintiff Prestrud, and

---

1. Later the northern boundaries were extended.

in 1956 Mr. Prestrud advised Chambers of the district's need for private financing and told him that the district was willing to pay a substantial premium for this service. Chambers talked to the persons in charge of the district and the proposition looked attractive. In further discussions it was determined that the idea was to build the water plant in two stages. Phase or stage one called for a pump to supply 150 taps. This would return the investment and yield a small profit. After that, phase two was to be built and this would include additional pumps and a building to house the equipment. It also contemplated a one million gallon reservoir. The proposal was that upon completion of the first stage there would be a lease to the district. The rental would be $25.00 for each tap; this sum to be paid at the time of each connection. If phase one only was carried out, the district promised to pay the cost of phase one, plus $200.00 for each tap. If the second phase was carried out, it was proposed to pay Prestrud and Chambers a profit of $225,-000.00 over and above the actual original cost of the water system.

There are several written agreements which disclose the understanding between Prestrud and Chambers on the one hand and the water district on the other. There is a proposal which is dated April 30, 1956, a lease dated June 7, 1958, together with the first addendum signed on the same date, and a second addendum dated June 7, 1958. In addition, there is a contract of sale dated June 30, 1960. The basic contract is, however, the proposal. This proposal was made by the plaintiff Chambers to the North Washington Street Water Sanitation District on April 30, 1956. It was accepted by the district on the same day. In the proposal Mr. Chambers referred to himself as the lessor and expressly reserved the right to assign all lessor's rights, obligations and interests to a legal entity which may be a corporation to be formed by the lessor. This proviso further stated that in such event the legal entity would assume all of the rights and obligations

of the lessor under the proposal and that the lessor would be relieved of personal liability. Other terms of the proposal set forth the detailed blueprint for the construction of the water system and for the ultimate transfer of it to the water district. It was agreed that the facility would be constructed in accordance with specified plans. Phase one (Proposals two and three) were to be constructed first, and phase two (called Proposal one) was to be constructed at a later date. Upon completion of the facilities described in Proposals Two and Three these water facilities were to be leased to the district for a limited term and for a token rental. The lease was to commence upon completion of phase one and was to continue until twelve o'clock noon, February 1, 1960. The rental was to be $25.00 per connection, payable at the time that the connection was made.

The proposal required the water district to charge a connection fee of $250.00 per connection and further required the $250.00 connection fee to be placed in a special account called the "Connection Fee Account." The principal of such account was to be used for no purpose except the purchase of the water system in accordance with the terms of the proposal. The water district was required to maintain the schedule of water rates and charges sufficient in amount to allow the water district to pay all of the operating expenses of the system and to make all the payments to the lessor which were required by the terms of the proposal. If upon expiration of the lease lessor had constructed the facilities described in both Phase One and Two, the lessor was to convey the water system to the water district for a total purchase price of $225,000.00 plus the actual original cost of the water system.

If upon expiration of the lease there had been constructed only the facilities described in Phase One (Proposals two and three), the plaintiffs were to convey the water system to the district for a total purchase price equal to the number of connections at $200.00 each, plus the actual construction cost.

The method of payment in the event that both phases were constructed as set forth in the proposal called for payment first from the connection fee account. If the total of the connection fee account was insufficient to pay the entire purchase price, the water district was required to pay over to the plaintiffs on account of the purchase price the entire amount in the connection fee account. The balance of the purchase price was reserved to the plaintiffs in the deed of conveyance and was to bear interest at the rate of six per cent per year. The unpaid balance was to be payable out of net revenue from the operation of the water system in accordance with the schedule of percentages of the original investment which increased in proportion to the number of connections made. The water district was to have the right to make additional payments in excess of those set forth in the schedule, and these payments were to be credited against principal. The district was required to pay on principal $225.00 of each connection fee received by it after the expiration of the lease until the lessor was paid in full.

During the period of the lease all expenses of operating and maintaining the system were to be paid by the water district whereas the plaintiffs were required to pay all real property taxes. The proposal also contained a provision whereby the water district undertook to utilize the system for serving all the users in the area of the district which the capacity of the plant would permit and to continue to do so until the lessor had been paid in full the purchase price "hereinabove specified."

Some difficulties were encountered in the construction of the initial stage of the water system. The contractor experienced financial troubles and the district did not develop as anticipated. The lease was not entered into, therefore, until June 7, 1957,[2] and at that time there were only twenty-two taps, or connections— less than fifty per cent of the number which had been contemplated at this stage. Nevertheless, stage two of the construction commenced in the fall of 1957. There were seventy-five tap connections at the time, rather than the 150 which were contemplated in the proposal. The testimony was to the effect that stage two was constructed because a plant was necessary in order to encourage the area to develop. Phase two was completed in June, 1958. Stage one cost some $93,000.00, and in addition some $19,000.00 had to be paid for extras, or an extension. Also $17,000.00 were paid by plaintiffs in order to obtain clear title to the water rights. Stage two cost $109,000.00. The lease terminated January 30, 1960, and at that time the water system was transferred to the water district. The total purchase price was $487,056.75. As of the date of the closing the district paid over the sum of $162,800.00. The unpaid balance was to be paid in accordance with a formula identical to that set up in the basic proposal of April 30, 1956. It called for installments, the amount of which were related to the number of connections. Interest at six per cent had to be paid on the unpaid amounts.

On February 1, 1960, there were 814 water tap connections. It is pointed out by plaintiffs that as of February 1, 1960,[3] there were only 814 water tap connections, and that under the contract the district was only required to make annual payments if it had sufficient net operating income of $19,200.00. It is said that under the terms of the contract unless there were 850 or more water taps, no portion of the unpaid balance of the principal had to be paid. This is in support of plaintiffs' argument that the transfer was the taxable event and that then the asset was not profitable.

It is emphasized by plaintiffs that the obligation was not secured by a mortgage and that payment depended upon the construction of houses and the making of connections.

2. It was to have commenced on January 1, 1957.

3. The date of transfer of the system from P–C to the district.

It is to be noted that in February of 1962 the district held a bond election which authorized the issuance of bonds to pay off the amount owing to the shareholders of P-C. As of this time the bond issue was attractive because it meant reduction of interest from six per cent under the contract of sale to four per cent or less on the bonds.

P-C Enterprises was organized May 3, 1956. L. O. Prestrud acquired 3,000 shares of Class A common stock for $30,-000.00, and Cummins Diesel Sales of Colorado Company, the partnership of Mr. Chambers, acquired 3,000 shares of Class B common stock for $30,000.00. On May 4, 1956, the contract for the water district was assigned to the company. On July 31, 1961, the Board of Directors and the shareholders of P-C voted to liquidate and dissolve it. On August 1, 1961, the corporation distributed to the shareholders their pro rata share of the corporation's rights under the contract with the water district. On the date of the distribution the unpaid balance owed by the water district was the sum of $315,633.75. Thereafter, the water district made monthly payments directly to the shareholders until March 2, 1962, when it paid in full the outstanding balance due. The liquidation of P-C Enterprises was not completed until July, 1962.

The amount which the District Director determined the company should have included in income for its taxable year ending March 31, 1962, was the difference between the corporation's remaining cost basis of the water system and the amount unpaid (on August 1, 1961) by the water district to the corporation's shareholders pursuant to the assignment of the contract by the corporation. The two plaintiffs, Prestrud and Cummins Diesel, paid the deficiency assessment, as noted previously, and now bring actions for a refund.

Basically, the question is whether the company realized income in the fiscal year ending March 31, 1962, as evidenced by the alleged anticipatory assignment from the corporation to the shareholders. A further question is whether the income was ordinary income or whether it is eligible for treatment as capital gain. There is also an issue (based on plaintiffs' contention) as to whether, if it is determined that P-C Enterprises Company realized income in the fiscal year ending March 31, 1962, this may be spread over the taxable years ending March 31, 1960, and March 31, 1961, as well as March 31, 1962, by reason of Section 481(b) (1) of the Internal Revenue Code of 1954.

I.

The first question is whether P-C realized taxable gain for the year ending March 31, 1962, and whether the Commissioner was justified in assessing the tax in the fiscal year ending March 31, 1962.

Plaintiffs argue that Section 336 of the Internal Revenue Code precludes the assessment since this section provides that no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.[4]

Plaintiffs also argue that the assessment necessarily changes P-C's method of accounting and that the year for changing it is not the fiscal year ending March 31, 1962, but rather the year that the system was transferred to the district —the fiscal year ending March 31, 1960. As of the date of the transfer, February 1, 1960, so the argument goes, the district's promise to pay had no market value; hence there was no income and no tax for this crucial year. Plaintiffs also argue that inasmuch as the Commissioner's action changed P-C's method of accounting, his action brings into play

4. The section provides in part that no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation. The reg-ulation, 1.336–1 declares that no gain or loss is recognized to a corporation on the distribution by it of property in kind in partial or complete liquidation.

Section 481(b) (1) of the Internal Revenue Code and that this section requires the income to be spread over a three year period starting with the fiscal year 1960. There is other debate as to whether P-C is or is not a collapsible corporation and, if so, whether the income is barred by the applicable statute of limitations.

These latter arguments are ingenious, technical, complex, and in some instances they border on the enigmatic, but as we view the case they skirt the issue which we regard as decisive, and that is whether the liquidation together with the distribution from P-C to the plaintiffs constituted an anticipatory assignment of income within the doctrine of Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). We have concluded that such an anticipatory assignment or arrangement occurred and that the Commissioner was therefore correct in making the assessment against P-C.

It is important to recall that during the very fiscal year that the dissolution and distribution occurred the district paid off the entire amount of the outstanding obligation, both principal and interest, to the plaintiffs. This was a result of a bond issue which had been approved prior to March 31, 1962, the end of P-C's fiscal year. Had the distribution not occurred, the full amount of profit would have been unquestionably taxable to P-C. The job itself had been completed long prior to August 1, 1961, the date of dissolution and distribution and P-C's right to be paid had completely ripened. The district was at the time required to pay installments but was also at liberty to pay off the principal and thus avoid the payment of high interest. All of P-C's services had been performed and while P-C did not have a mortgage on the property of the district, the district's revenues were earmarked for the payment of the obligation. Hence, the asset was an account receivable which was well secured as of August 1, 1961. It is true that P-C could not insist upon full payment at any given time; they could only look forward to payment in accordance with the demands of the contract, but full payment, although possibly eventual, was nonetheless certain.

 There is, of course a great body of law on the subject of avoidance of tax by assigning the right to receive it. See 2 Merten's Law of Federal Income Taxation, Chapter 18. The author points out that the principle has long been recognized that income is to be taxed to the one who earns it or otherwise creates the right to receive it and to enjoy the benefits of it when paid. Thus such assignments are always subject to careful examination. This doctrine had recognition prior to the decision of the Supreme Court in Helvering v. Horst, supra. However, that decision established criteria for the application of the principle and Helvering v. Horst is now generally regarded as the leading authority in this area. In that case the cash basis owner of negotiable bonds detached from them negotiable interest coupons shortly before their due date and delivered them as a gift to his son who, in the same year, collected them at maturity. In ruling that the income was realized even though it was not actually received by the donor, the Supreme Court held that actual receipt of the income is not the only way for income to be realized—that the enjoyment can be consummated by some event other than actual receipt of the money. Thus when he has made such use or disposition of his power to receive or control the income as to procure in its place other satisfactions which are of economic worth he realizes income. The gift to his son was held to be the enjoyment of the gain to the same extent as would have been present had he actually received the income. The Court said at 311 U.S. 118–120, 61 S.Ct. 147–149:

> "The power to dispose of income is the equivalent of *ownership* of it and the exercise of that power to procure the payment of income to another is the *enjoyment* and hence the *realization* of the income by him who exercises it. * * * "

\* \* \* \* \* \*

"The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid."

\* \* \* \* \* \*

" \* \* \* the fruit is not to be attributed to a different tree from that on which it grew." [5]

Thus, the questions which were emphasized in *Horst* are (1) the necessity of the realization of income in order for it to be taxable, particularly in the case of a person in the cash receipts and disbursements basis; (2) the importance of the "control" of income in determining the person to be taxed; and (3) the effect of the enjoyment of income on the liability for tax thereon. The Court in *Horst* pointed out that the donor had control of the bonds and the coupons and further that the transfer of these coupons to donor's son constituted enjoyment and realization of the income. The Supreme Court thus construed "enjoyment" and realization in much broader terms than ever before.

Subsequent cases have applied this doctrine in a wide variety of circumstances, and it is unnecessary to examine the numerous cases which have considered it. It is helpful to note a few of the decisions which are analogous to the present case.

In Commissioner of Internal Revenue v. First National Bank of Stratford, (C. A. 5 1948) 168 F.2d 1004, the taxpayer had written off as worthless certain notes. A deduction for these supposedly worthless debts had been taken. Later when it became apparent that these notes would be paid the taxpayer bank decided to distribute the notes in kind as a dividend to its shareholders. The Court held that the distribution of the notes was anticipatory and constituted the realization of income by the taxpayer. The Court asked the question: "May a bank detach interest coupons from negotiable bonds owned by it, assign the coupons to its shareholders as a dividend in kind, and avoid the payment of income tax on the interest subsequently collected by the assignee of the coupons? In other words, by means of a dividend in kind, may a corporation avoid income taxes by doing exactly what was done (without success) by an individual by means of a gift in Helvering v. Horst \* \* \*?" The Court held that the distribution constituted a realization of income and added the following pertinent comment:

"The avoidance of taxes may be perfectly legitimate, but it cannot be done by the anticipatory assignment of notes representing income, as a dividend in kind, and the subsequent collection of said notes by the assignees. \* \* \*" 168 F.2d at 1009.

The *Horst* doctrine was applied by our circuit in Anthony's Estate v. Commissioner of Internal Revenue, 155 F.2d 980 (10 Cir. 1946) wherein a taxpayer on a cash basis made a gift in 1937 of an interest in an oil and gas lease with the impounded income. The income was actually received by the donee and his assignee in 1940. It was held that the income was taxable to the donor. The Court in an opinion by Judge Murrah said:

" \* \* \* the income involved here had been earned by Anthony as the owner of its source when it was transferred by gift to his brother. But the last step by which he obtained the fruition of the economic gain which had already accrued to him occurred in 1940 when it was actually paid to his donee and his assignees. He procured the payments of the proceeds of the oil to his donee, thereby realizing economic gain in the year of its actual payment the same as if he had received it himself. Actual payment to the assignees constituted constructive payment to him." 155 F.2d at 982.

A decision which is almost the same as the case at bar on both facts and law is Williamson v. United States (1961) 292 F.2d 524, 155 Ct.Cl. 279. Here the corporation taxpayer operating on a cash

5. Citing Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

basis distributed accounts receivable incident to dissolution. In a fully reasoned decision the Court of Claims held that the property distributed was taxable to the corporation notwithstanding the liquidating distribution. The Court of Claims considered whether Section 336 of the Internal Revenue Code of 1954 was applicable and concluded that Congress did not intend to change the anticipatory assignment rule recognized and applied in *Bank of Stratford* and *Horst*. The Court declared:

"As we stated above, we believe that both §§ 311 and 336 of the Code must be given consistent interpretations and that they are both subject to the Bank of Stratford rule. In cases as the one at bar, ordinary and liquidating dividends are to be treated alike. Furthermore, Jud Plumbing, Standard Paving, Scofield, Bank of St. Elmo and Ungar, all cited above, held the payment of liquidating dividends to be realizations of income to the corporations involved. We note particularly the case of Floyd v. Scofield, supra [5 Cir., 193 F.2d 594], because it contained the important factors present in the instant case, a cash method taxpayer and a distribution of accounts receivable as liquidating dividends. The Fifth Circuit Court of Appeals reached the same conclusion in that case that we reach now. 292 F.2d at 530.[6]

We agree with the reasoning in *Williamson* that Section 336, supra, was not intended to abrogate the anticipatory assignment doctrine.

The fact situation at bar is peculiarly susceptible to what might be called the anticipatory assignment doctrine. First, the property assigned was entirely within the control of the assignor P-C. Secondly, it constituted and resulted in full enjoyment of the income by P-C in that it brought about actual enjoyment of the income by the persons directly involved and interested—its sole shareholders. In doing so the corporation fulfilled its mission and thereby realized income more dramatically than did the donor in *Horst*. This was an important purpose for its existence. Thirdly, the payment income is not remote in time from the assignment; indeed, it occurred in the same fiscal year. Thus, it is a simple matter to conclude that the receipt by the plaintiffs of the principal and income was a constructive receipt by P-C. In view of these considerations, the case at bar poses a classic one for application of the *Horst* doctrine.

In view of our conclusion that the receipt of the income by the plaintiffs was in fact and law a receipt by P-C there is no occasion for modifying the accounting method of P-C. It was received during the fiscal year on a cash basis. Accordingly, no problem of apportionment of income exists.

## II.

The final point involves the plaintiffs' contention that if the corporation is to be charged with the tax that it should not be treated as ordinary income but rather as a long term capital gain. The plaintiffs say that either Sections 1221 or 1231 of the Internal Revenue Code of 1954 apply; that the water system is a capital asset and that there was a sale. They further argue that the transaction was a single non-recurring speculative venture which must be regarded as a capital transaction subject to the mentioned provisions of the Internal Revenue Code.

There can be little doubt but that the system was a capital asset; further, it was held by P-C for a period in excess of six months. In other respects, how-

6. The Court is referring to Jud Plumbing & Heating, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1946, 153 F.2d 681; Standard Paving Co. v. Commissioner of Internal Revenue, 10 Cir., 190 F.2d 330, cert. denied 1951, 342 U.S. 860, 72 S.Ct. 87, 96 L.Ed. 647; Floyd v. Scofield, 5 Cir., 1952, 193 F.2d 594; First National Bank of St. Elmo v. United States, 7 Cir., 1952, 194 F.2d 389; J. Ungar, Inc. v. Commissioner of Internal Revenue, 2 Cir., 1957, 244 F.2d 90.

ever, it fails to qualify for capital gains treatment.

 From an examination of the original proposal to the North Washington Street and Sanitation District, it is apparent that the plaintiffs' undertaking essentially was to finance this enterprise and to build it. Thus the plaintiffs were in effect building contractors who were also providing the financing for a fee. The water system was appropriated to the use of the water district from the very beginning. It was constructed for the water district and for no one else. The construction price was fixed at the very outset on a cost plus fixed fee basis. Thus, as we view it, the water district undertook to pay plaintiffs for the use of their money and for assuming the responsibility of building the plant. The fact that the plans were drawn by a third party and that the actual building was performed by contractors does not change the character of the arrangement. It often happens that the prime contractor subcontracts all of the actual work.

 In urging that the system was a capital asset which was sold, plaintiffs stress the fact that the system became less speculative and more secure as time went on. The answer to this is that the measure of the plaintiffs' compensation never changed. Thus it is a case of realization of compensation for services rendered and for the use of money. In such a case the income realized is ordinary income. See United States v. Midland-Ross Corp., 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214. The fact that a fixed fee was provided for the construction of the system makes it clear that plaintiffs were performing services for a profit. They were not holding this asset and awaiting its appreciation in value and looking forward at the same time to selling it to the highest bidder. Their profit was guaranteed and the only question was when they would get paid.

 The use of a lease arrangement and the so-called option to purchase does not change the basic character of the arrangement. Its character was established in the original proposal and subsequent characterizations do not serve to change its basic nature, nor can the formal closing and transfer make a sale out of a construction and financing transaction. It is the substance of the transaction which governs rather than its form. See 3B Mertens, supra, § 22.92, p. 524.

We conclude that the gain realized by P-C is not entitled to capital gains treatment; that it must be treated as ordinary income.

Defendant is entitled to judgment of dismissal in each of the cases, and counsel are directed to submit a final judgment to the Court for signature. Defendant is granted ten (10) days within which to accomplish this.