JOSEPH MALONEY AND HELEN MALONEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52922. Filed March 13, 1956.

*Charles W. Davis, Esq.*, for the petitioners.
*Robert R. Veach, Esq.*, for the respondent.

## OPINION.

Rice, *Judge:* The principal issue to be decided herein is whether a trader who maintained simultaneous long and short positions in futures of the same commodity, prior to the effective date of section 117 (1) of the 1939 Code,[2] is entitled to have each of such simultaneous positions recognized for tax purposes where one of such positions was maintained in job-lot quantities of the commodity and the other in round-lot quantities. Petitioner established simultaneous positions in soybean futures on August 11, 1949, by entering into two contracts on the Chicago Board of Trade commodity market, one for the purchase of 50,000 bushels of May soybeans, in job-lot quantities, and the other for the sale of an equal amount of May soybeans in round-lot quantities. During subsequent months, he bought and sold hundreds of thousands of bushels of May soybeans futures in round-lot quantities; but not until April 25, 1950, did he enter into a contract to sell May soybeans in job-lot quantities. On that date, he entered into contracts for the sale of 50,000 bushels of May soybeans in job lots. In accordance with the rules of the Chicago Board of Trade,[3] the brokerage house through which petitioner cleared his various trades maintained separate accountings for the transactions in job lots and those in round lots, thus closing out petitioner's short position in May soybeans in round lots during the months of No-

---

[2] Section 117 (1) is applicable with respect to taxable years beginning after September 23, 1950, and, therefore, does not govern the result in the instant case. It states, in part, as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

(1) SHORT SALES, ETC.—In the case of a short sale of property made by the taxpayer after the date of the enactment of the Revenue Act of 1950:

(1) SHORT-TERM GAINS AND HOLDING PERIODS.—If substantially identical property has been held by the taxpayer on the date of such short sale for not more than 6 months (determined without regard to the effect, under subparagraph (B) of this paragraph, of such short sale on the holding period), or if substantially identical property is acquired by the taxpayer after such short sale and on or before the date of the closing thereof—

(A) any gain upon the closing of such short sale shall be considered as a gain upon the sale or exchange of a capital asset held for not more than 6 months (notwithstanding the period of time any property used to close such short sale has been held) ; and

(B) the holding period of such substantially identical property shall be considered to begin (notwithstanding the provisions of subsection (h)) on the date of the closing of the short sale, or on the date of a sale, gift, or other disposition of such property, whichever date occurs first. This subparagraph shall apply to such substantially identical property in the order of the dates of the acquisition of such property, but only to so much of such property as does not exceed the quantity sold short.

[3] Although regulations promulgated by the Secretary of Agriculture under the Commodity Exchange Act required that simultaneous long and short positions established by a trader in the same commodity on the same market be offset against each other, a specific exception was made for simultaneous positions in job lots and round lots of the same commodity, provided that job lots and round lots were cleared separately, as they were on the Chicago Board of Trade.

vember 1949 through February 1950, but holding open petitioner's long position in job lots until the offsetting sale in job lots was made some 8 months later. On his return for 1950, petitioner treated his purchases and sales of May soybeans in round-lot quantities as short-term capital transactions, but treated the two job-lot transactions entered into during 1949 and 1950, namely, the purchase on August 11, 1949, and the sale on April 25, 1950, as the purchase and sale of a capital asset held for more than 6 months and thus entitled to long-term capital gains treatment.

Respondent contends that petitioner did not sell or exchange any property on April 25, 1950, which he had held 6 months or longer. He argues that petitioner's August 11, 1949, purchase in job-lot quantities was effectively offset on the same day when petitioner sold an equal amount of May soybeans in round lots and that to fail to regard these two transactions in that light, for income tax purposes, is to place form over substance. Respondent relies on the Bureau of Internal Revenue Ruling, Mim. 6243,[4] issued on March 8, 1948, to support his determination. That ruling states in pertinent part as follows:

1. Wide publicity has been given to the statement of the Secretary of Agriculture, released to the press on December 4, 1947, to the effect that certain futures transactions in commodities "appear fictitious in nature and should be eliminated." Specifically, the Secretary referred to offsetting purchases and sales in the same futures contract as a device used by speculators to postpone, reduce, or avoid Federal income taxes.

2. * * * The factual basis for the Secretary's statement was the existence of a large number of traders' accounts having equal offsetting purchases and sales of the same commodity in the same market, which transactions were being held open rather than balanced off against each other and closed out. These so-called "open positions" were thus, as a matter of fact, closed, except that the offset, as a bookkeeping matter, had not been made. * * *

3. It is well established that fictitious or sham transactions may be disregarded in the determination of true tax liabilities and that if, upon an analysis of a transaction, it appears that substance rather than form should govern, the form of the transaction may be disregarded. (See *Gregory* v. *Helvering*, 293 U. S., 465, Ct. D. 911, C. B. XIV–1, 193 (1935); *Helvering* v. *Clifford*, 309 U. S., 331, Ct. D. 1444, C. B. 1940–1, 105; *Commissioner* v. *Tower*, 327 U. S., 280, Ct. D. 1670, C. B. 1946–1, 11; *Bazley* v. *Commissioner*, 155 Fed. (2d), 237, affirmed, 331 U. S. 737, Ct. D. 1687, C. B. 1947–2, 79.).

4. In its audit of returns of taxpayers trading in commodity contracts, the Bureau will consider that offsetting trades in the same commodity in the same market for delivery in the same contract period are closed as of the moment the offsetting trade was made, and that the gain is realized or the loss is sustained at that time since such holding accurately reflects the realities of commodity trading. * * *

However, after careful examination of the above ruling and all the evidence submitted with respect to trading on the Chicago Board of Trade commodity futures market, we are convinced that the re-

[4] 1948–1 C. B. 44, 45.

spondent's determination is erroneous. We think it clear that, in a commodity market where round lots and job lots are cleared separately, a long position in job lots need not be offset, for tax purposes, against a simultaneous short position in round lots. The first paragraph of Mim. 6243 indicates that it was being issued to implement a statement of the Secretary of Agriculture to the effect that certain futures transactions in commodities "appear fictitious in nature and should be eliminated." However, reference to the regulation which was issued by the Secretary of Agriculture "in aid of the prohibition against wash sales and fictitious sales contained in the Commodity Exchange Act," [5] discloses that the Secretary did not consider the establishment of simultaneous positions in job lots and round lots to be fictitious in nature, and specifically provided that such transactions should not come within the scope of his regulation, if such purchases and sales were made on commodity markets where round lots and job lots are cleared separately. Not only were round lots and job lots separately cleared on the Chicago Board of Trade commodity futures market, but the entire pattern of trading on this market convinces us that there was true economic significance in the use of two different quantity units for trading in soybeans and that transactions in one quantity unit must be regarded as entirely separate and distinct from transactions in the other.

The overwhelming majority of the transactions executed on the Chicago Board of Trade commodity futures market were made in quantity units of 5,000 bushels, known as round lots. In order to permit smaller consumers of grain, who normally ship or buy in quantities of less than 5,000 bushels at a time, to enter the market for hedging purposes, trading was permitted in quantity units of 1,000 bushels, known as job lots. Trading in job lots also enabled individuals with limited capital to enter the market and invest in commodity futures. Trading in the two quantity units of the same commodity was carried on in such a manner that trading in one quantity unit was as separate and distinct from trading in the other as it would have been had the trader been dealing in entirely different commodities. Thus, job lots and round lots were traded in separate sections of the grain pit, were separately recorded and accounted for, were separately cleared, involved a price differential usually amounting to one-fourth cent per bushel, involved a differential in brokerage and commission charges, and involved a different class of investors and different business purposes. Clearly, such distinctions show that, in the instant case, there was true economic reality to the maintenance of simultaneous positions in the same commodity, where one of such positions was maintained in job lots and the other in

---

[5] 12 Fed. Reg. 8266 (Dec. 10, 1947) ; 17 C. F. R. Sec. 1.46.

round lots. Under these circumstances and in view of the express recognition given by the Secretary of Agriculture to the difference between job lots and round lots, we hold that trading in job lots must be regarded as separate and distinct from trading in round lots for tax purposes.

The weakness and fallacy of respondent's position herein are illustrated by his admission that none of petitioner's transactions were fictitious or sham. He states that he "recognizes the existence and legality of each of petitioner's contracts" but "* * * inasmuch as none of petitioner's contracts were fully executed, but were offset prior to delivery, that in determining *which contracts* should be *offset* against each other for purposes of income tax, consideration should be given to substance and not to the form employed by petitioner." There is an inherent contradiction in respondent's position since, if we give consideration to the "substance and not to the form employed by petitioner" and the contracts entered into by petitioner were not fictitious or sham, we are obviously not free to manipulate the results of petitioner's trading by offsetting one type of contract against another type which was recognized as entirely separate and distinct by the Secretary of Agriculture and all others engaged in buying and selling such contracts on the Chicago Board of Trade. Petitioner was not trading in fungible grain but rather, in contract rights to the commodity. It is the contract itself with its specific terms, rather than a quantity of a fungible commodity, which constitutes "property held by the taxpayer" within the definition of the term "capital assets" prescribed by section 117 (a) (1) of the 1939 Code. Since the bundle of rights in job-lot contracts on the Chicago Board of Trade were clearly distinguishable from the rights created by contracts in round lots, these two types of contracts must be recognized as separate and distinct capital assets under section 117 (a) (1).

Moreover, we think the result herein is buttressed by the line of cases which recognizes that, prior to the addition of section 117 (1) to the 1939 Code by section 211 of the Revenue Act of 1950, simultaneous long and short positions could be maintained and recognized for tax purposes in securities trading. *Richardson* v. *Commissioner*, 121 F. 2d 1 (C. A. 2, 1941) certiorari denied 314 U. S. 684 (1941); *William V. Griffin*, 45 B. T. A. 588 (1941); *Robert W. Bingham*, 27 B. T. A. 186 (1932). As we have indicated above, transactions in round lots and job lots of the same commodity are clearly identifiable as separate and distinct transactions and we can see no reason why such transactions should not be granted treatment similar to that accorded securities prior to the enactment of section 117 (1).

In reaching our conclusion set out above, we do not decide whether on and after September 23, 1950, the effective date of section 117 (1),

the above transactions would be entitled to short-term or long-term capital gain treatment since such question is not before us.

The remaining issue to be decided is whether petitioners' failure to make and file a declaration of estimated tax for the year 1950 was due to reasonable cause, thereby excusing them from the addition to the tax determined by respondent under section 294 (d) of the 1939 Code. Section 58 (a) of the 1939 Code requires an individual to make and file a declaration of estimated tax if either of the two following conditions applies:

(1) his gross income from wages (as defined in section 1621) can reasonably be expected to exceed the sum of $4,500 plus $600 with respect to each exemption provided in section 25 (b) ; or

(2) his gross income from sources other than wages (as defined in section 1621) can reasonably be expected to exceed $100 for the taxable year and his gross income to be $600 or more.

It is further provided, in section 58 (d),[6] that if the requirements for filing are not met before March 1 of the taxable year, but are met at some time subsequently during that taxable year, then a declaration of estimated tax must be made and filed on or before either of the three alternate dates specified.

Respondent has determined that, although the salaries received by each of the petitioners during 1950 were insufficient to require their filing individual or joint declarations of estimated tax under section 58 (a) (1), petitioners could reasonably be expected to have realized that, in addition to their income from wages, their income from sources other than wages would exceed $100 during 1950, thus requiring the filing of an estimated tax return pursuant to section 58 (a) (2). Petitioners contend that their income for 1950 from sources other than salaries was a highly uncertain one, thus justifying their failure to file an estimated tax return. First, they point out that at the beginning of 1950 a $20,000 claim was outstanding against petitioner, arising from a prior partnership venture. They argue that they might have been required to dispose of their total investments in stocks and bonds in order to settle this $20,000 claim, thus eliminating potential dividend and interest income. However that may be, it appears from the record that this claim was settled for $1,500 during 1950, and that petitioners did not have to sell their securities. Peti-

---

[6] SEC. 58. DECLARATION OF ESTIMATED TAX BY INDIVIDUALS.

(d) TIME AND PLACE FOR FILING.—

(1) IN GENERAL.—The declaration required under subsection (a) shall be filed on or before March 15 of the taxable year, except that if the requirements of section 58 (a) are first met

(A) after March 1 and before June 2 of the taxable year, the declaration shall be filed on or before June 15 of the taxable year, or

(B) after June 1 and before September 2 of the taxable year, the declaration shall be filed on or before September 15 of the taxable year, or

(C) after September 1 of the taxable year, the declaration shall be filed on or before January 15 of the succeeding taxable year.

tioner received dividends of $275 and interest of $189.38 during 1950. At least $150 of the dividend income was received prior to the end of July of that year, thereby meeting the requirement of section 58 (d) that an estimated tax return be filed on or before September 15 if one had not previously been filed.

However, petitioner's main source of income, other than salaries, was from his activities as a trader in commodity futures. He could reasonably have expected, on or before March 15, 1950, that he would realize a gross income substantially in excess of $100 from this activity. Actually, petitioner realized a profit of over $30,000 during the first 5 months of 1950 from trading in soybeans. Petitioner argues that, because of the speculative nature of commodity trading, there was no assurance that he would not suffer net losses from such transactions during the year 1950 and cites the fact that, in 1952, he actually did suffer substantial net losses from trading in commodity futures. However, petitioner obviously intended to realize a substantial profit from his commodity trading activities. His profit during the first 5 months of 1950 was so large that regardless of the speculative nature of this activity he should have filed an estimated tax return.

Petitioner, as a licensed broker and office manager, is a man of considerable professional and business experience. His gross income in 1950 was so substantially in excess of the minimum requiring the filing of a declaration that we must hold that his failure to file was not due to reasonable cause.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*, dissenting: There is not a sufficient economic and realistic distinction between round and job lots of these transactions in futures to reverse the Commissioner's determination.

HARRON, OPPER, and PIERCE, *JJ.*, agree with this dissent.