MEYER J. STAVISKY AND THERESA Z. STAVISKY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65637. Filed April 29, 1960.

*Asher Lans, Esq.*, for the petitioners.
*Clarence P. Brazill, Jr., Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in petitioners' 1951 income tax in the amount of $12,861.64. The sole issue remaining is whether he erred in characterizing a payment by petitioners in the amount of $31,150 as a long-term capital loss.

FINDINGS OF FACT.

The stipulated facts are so found.

Petitioners are husband and wife residing in Brooklyn, New York. Their joint income tax return for 1951 was filed March 7, 1952, on the cash and calendar year basis with the then collector of internal revenue for the first district of New York. Meyer J. Stavisky will hereinafter be called the petitioner.

Sometime prior to September 10, 1950, a plan of reorganization had been proposed for the Missouri Pacific Railroad (hereinafter called Mo-Pac), under which new preferred stock was to be issued and listed on the New York Stock Exchange.

On September 19, 1950, petitioner contracted to deliver to Ira Haupt & Co. (hereinafter called Haupt) 10,000 shares of such proposed stock on a "when issued" basis, at a price of 58¼ per share. The following day he contracted to buy 10,000 such shares from Haupt at 58⅜ per share. Both agreements contained the following:

It is understood and agreed that all transactions made for you are subject to the rules and customs of the Exchange or Market (and its clearing house, if any), where executed by us or our agents; that we have the right to close transactions without further notice at public or private sale, without liability for subsequent differences in value, when such a sale or purchase is deemed necessary by us for our protection; * * *

Such contracts for the purchase of when, as, and if issued securities are referred to generally as "when issued" contracts. At all times pertinent to this case there was trading on the New York Stock Exchange in such contracts having this new Mo-Pac preferred stock as their subject matter and official price quotations of the N.A.S.D.[1] on them were published daily in newspapers.

When stock traded on a "when issued" basis rises in price, a customer-seller may have to "mark to market," that is, deposit cash or securities to cover his potential loss liability. Conversely, a fall in price may require a customer-buyer to "mark to market." However, so long as the transaction remains open, the customer will not realize or receive any amount as a result of changes in market value in favor of his position.

By December 1951 the price of Mo-Pac "when issued" stock had risen considerably. Petitioner was concerned over the "mark to market" requirements of his contract to sell, which would have entailed the deposit of substantial cash.

Late in December of 1951 petitioner transferred 40 per cent of his selling contract to Sutro Bros. & Co. (hereinafter called Sutro), paying the latter $31,150 as consideration for its assumption thereof.

On January 2, 1952, petitioner and Haupt entered into a contract under which petitioner transferred to Haupt 40 per cent of his contract to purchase Mo-Pac "when issued" shares. Haupt paid petitioner $29,975 as consideration therefor.

In his income tax return for 1951 petitioner claimed the payment to Sutro as a deduction from ordinary income. In his 1952 return he reported the amount received from Haupt as a long-term capital gain.

On or about December 22, 1954, the proposed plan of reorganization of Mo-Pac failed. Contracts to purchase and to sell the proposed preferred shares on a "when issued" basis were then canceled.

---

[1] National Association of Securities Dealers.

OPINION.

Petitioner first argues that his 1951 transaction with Sutro constituted merely a payment by him for his release from an obligation, rather than a sale or exchange. We do not agree.

Petitioner was a party to a bilateral contract with mutual rights and obligations, not a mere obligor. Had the market price of Mo-Pac shares "when issued" declined instead of risen, his rights under his contract to sell would have outweighed his liabilities (as happened here with respect to his contract to buy), and he would have been the payee rather than the payor as the result of the transaction of December 1951 (as was the case when he sold part of his purchase contract in 1952). We think it clear that in such case he would have been in the position of having sold a portion of his rights under the contract (consistent with his treatment of his 1952 transaction) and are not prepared to hold that a given transaction is or is not a sale or exchange from day to day depending on the vagaries of the securities market.

Respondent has ruled in I.T. 3721, 1945 C.B. 164, that transfers of rights under "when issued" contracts constitute sales or exchanges of capital assets, and create capital gain or loss, in the following language (pp. 170, 171):

First, is the amount which A pays to B in consideration of B's assuming A's liabilities under the "when issued" sell contract deductible by A as an ordinary loss or as a business expense?

\*       .  \*       \*       \*       \*       \*       \*

It is held that the transaction is an exchange by A of his contract, a capital asset, and that the resulting loss is a capital loss within the meaning of section 117 of the Code.

Section 111(a) of the Code provides that the loss upon the sale or other disposition of property shall be the excess of the adjusted basis over the amount realized. Section 111(b) of the Code provides that the amount realized shall be the sum of any money received plus the fair market value of the property (other than money) received.

Presumably, A's contract to sell "when issued" stock of the Y Company at 20 cost him nothing in cash at the time it was entered into. However, A obligated himself to carry out the contract according to its terms. Such obligation should be treated as a part of the basis of the contract in A's hands. According to the form of the transaction, A received in the exchange B's agreement to assume A's obligation and this would equal in value A's basis. However, in view of the fact that A was required to pay B a cash amount, the substance of the matter is that the net value received by A was reduced by that amount. Thus, the excess of A's basis over the amount received by him in the exchange is equal to the amount which he paid to B.

We are not bound by respondent's rulings, but our independent analysis of this problem convinces us that respondent's position, as above stated, is sound. In *Lewis K. Walker*, 35 B.T.A. 640, 645,

we said: "Dealings in stock on a 'when issued' basis are not sales of stock, but merely sales of contracts to sell stock * * *." Also, cf. *Loewi & Co.*, 23 T.C. 486, 490, 492, affd. 232 F. 2d 621 (C.A. 7).

The foregoing is not changed by the fact that, prior to the transaction in question, Sutro apparently received from Haupt an assignment of the latter's rights under the same contract. The transaction of December 1951 was in form and substance a transfer to Sutro of petitioner's rights and liabilities under the contract, not a mere cancellation or release from liability. We thus hold that a sale or exchange took place within the meaning of section 117 of the Internal Revenue Code of 1939.

We turn now to the question of whether the loss thus occasioned was long-term, as determined by respondent, or short-term, as contended by petitioner. Both parties seem to agree that a "when issued" contract is itself a capital asset, apart from the securities contemplated therein. And cf. *Morris Shanis*, 19 T.C. 641, 650, affd. 213 F. 2d 151 (C.A. 3).

Petitioner relies on section 117(l) of the 1939 Code. Respondent argues, first, that this provision is inapplicable, and secondly, that even if it governs, the transaction in question created a long-term capital loss under its terms. We need not examine the soundness of the latter contention, as we are compelled to conclude that section 117(l) cannot apply here.

That provision, added by the Revenue Act of 1950 and effective for taxable years beginning after September 23, 1950, reads as follows:

> (1) SHORT SALES, ETC.—In the case of a short sale of property made by the taxpayer after the date of the enactment of the Revenue Act of 1950: * * *

The Ways and Means Committee Report accompanying the House version of this enactment reads in part as follows:

> At the present time it is possible for an investor in stocks to realize a capital gain in less than 6 months and obtain long-term capital gain tax treatment on it by *making* a short sale which will assure his gain on his original investment, and then defer closing out the short sale until he has held his original stock investment for more than 6 months. * * * [Emphasis supplied.]

H. Rept. No. 2319, 81st Cong., 2d Sess., p. 54. And the following appears in the Senate report:

> In the case of transactions in stocks or other securities on a "when issued" basis, the entry into a contract to sell such stocks or securities "when issued" shall be considered as a short sale and the performance of such contract or the assignment thereof for value shall be considered as a closing of such short sale. * * *

S. Rept. No. 2375, 81st Cong., 2d Sess., p. 87.

It is our opinion that for the purposes of that section a short sale, including a sale of securities "when issued," is "made" (as distinct from consummated or closed) when the initial commitment (here entering into the contract of September 19, 1950) was undertaken. The short sale in question here was thus "made" before the date of enactment of section 117(1), and it is inapplicable.

In December of 1951 petitioner transferred to Sutro not stock, nor even stock on a "when issued" basis, but rather 40 per cent of his rights and liabilities under his contract to sell. We have already determined that the mere fact that at the time of the transfer the obligations outweighed the rights thereunder in terms of comparative values does not prevent the transaction from constituting a sale or exchange. Petitioner became the owner and the obligor of these rights and on these obligations on September 19, 1950, and we accordingly hold that the sale thereof in December 1951 gave rise to a long-term capital loss.

Reviewed by the Court.

*Decision will be entered for the respondent.*