INTERNATIONAL FLAVORS & FRAGRANCES INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7768–70.   Filed May 16, 1974.

*George Rowe, Jr.*, and *Michael J. Gaynor*, for the petitioner.
*Marion L. Westen* and *Warren W. Dill*, for the respondent.

QUEALY, *Judge:* Respondent has asserted a deficiency in the Federal corporate income tax of petitioner for the taxable year 1967 in the amount of $73,715.

Certain concessions having been made by the parties, the following issues remain for decision:

(1) Whether petitioner's gain on a contract for the short sale of 1.1 million pounds sterling, entered into with First National City Bank and subsequently sold or transferred to Amsterdam Overseas Corp. just prior to the closing date, is taxable as ordinary income under the doctrine of *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955), making the gain realized on the transfer thereof taxable as ordinary income.

(2) Alternatively, whether the gain to petitioner on the above transaction should be taxable under the provisions of section 1233[1] on the basis that Amsterdam was, in substance, acting as a broker for petitioner in purchasing the pounds sterling used to close out the short sale.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS · OF FACT

Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference.

International Flavors & Fragrances Inc. (hereinafter referred to as petitioner or IFF (U.S.)) is a New York corporation with its principal place of business in New York, N.Y. Petitioner filed a United States corporate income tax return (Form 1120) and an information return with respect to controlled foreign corporations (Form 2952), respectively, for the taxable year 1967 with the district director of internal revenue, Manhattan District, New York, N.Y.

IFF (U.S.) is engaged in the creation and manufacture of flavor and fragrance products used by other manufacturers to impart or improve flavor or fragrance in a variety of consumer products. Its activities are conducted on a worldwide basis through numerous foreign corporations which it, directly or indirectly, owns or controls.

IFF (U.S.) prepares consolidated financial statements which it publishes regularly to its shareholders and to the public. For the purpose of such consolidated statements, the accounts of its foreign affiliates, which are expressed in foreign currencies, are converted into United States dollars. The accounts of its foreign affiliates, however, are not consolidated for United States income tax purposes. No other financial statements are published.

Of primary concern to the present inquiry is the relationship between IFF (U.S.) and its foreign affiliate, International Flavors & Fragrances I.F.F. (Great Britain) Ltd. (hereinafter referred to as IFF (G.B.)). IFF (G.B.) is a wholly owned foreign subsidiary of International Flavors & Fragrances I.F.F. (Nederland) N.V. (hereinafter referred to as IFF (Holland)) which, in turn, is wholly owned by IFF (U.S.). IFF (G.B.) has manufacturing, research, and administrative facilities in Enfield, England. It has additional manufacturing facilities in Haverhill, England.

During the latter part of 1966, IFF (U.S.) became concerned about a possible devaluation of the British pound sterling and the adverse effect it would have in converting the operations of IFF (G.B.) into dollars for purposes of its annual consolidated statement. In a letter to the comptroller in charge of European operations for the company, H. G. Reid, Financial Vice President of IFF (U.S.), suggested that the company sell short a sufficient amount of British pounds sterling to cover, on an after-tax basis, the exposed net current assets of IFF (G.B.), approximated to be, in terms of dollars, $1,600,000. Reid accordingly recommended the purchase of a 1-year pounds sterling contract in the dollar equivalent of $3 million, since on an after-tax basis, the protection afforded from such contract would be only 53 percent thereof.

On December 29, 1966, IFF (U.S.) entered into a written contract with First National City Bank of New York (hereinafter referred to as FNCB) pursuant to which IFF (U.S.) sold to FNCB 1.1 million British pounds sterling at $2.7691 per pound, delivery and payment to be made on January 3, 1968. The price FNCB agreed to pay per pound was approximately three-fourths of 1 percent below the then-prevailing dollar-pound exchange rate of $2.7918. The discount represented consideration for the risk to FNCB in writing a 1-year contract.

The contract provided that if, prior to the closing date, the market value of pounds sterling exceeded the exchange rate which FNCB was required to pay thereunder, FNCB could request IFF (U.S.) to deposit, as security for its own obligation under the contract, cash or its equivalent. IFF (U.S.) was additionally subject to certain penalties for noncompliance with the terms of the agreement. The contract further provided that FNCB had the power to place liens on any funds of IFF (U.S.) that were or might come into the possession or control of FNCB to enforce its rights under the contract.

IFF (U.S.) had the following dollar deposits on account with FNCB as of the following dates:

| | |
|---|---|
| Dec. 31, 1966 | $302, 616. 60 |
| Dec. 20, 1967 | 688, 691. 19 |
| Jan. 3, 1968 | 1, 928, 354. 37 |

On November 18, 1967, the British Government devalued the pounds sterling in terms of the U.S. dollar from $2.80 to $2.40.

On December 20, 1967, IFF (U.S.) entered into an agreement with Amsterdam Overseas Corp. (hereinafter referred to as Amsterdam), a large international banking institution located at 70 Pine Street, New York City. Neither IFF (U.S.) nor Amsterdam held stock in the other. The agreement, which was in letter form from IFF (U.S.) to Amsterdam and accepted by Amsterdam, read in pertinent part, as follows:

Enclosed is the original of our agreement of December 29, 1966 with First National City Bank which we hereby sell to you today for $387,000. This sale is on the understanding that you will fulfill the obligation to deliver Sterling 1.1 million to First National City Bank on January 3, 1968 without recourse to us.

On the same day as the above agreement was entered into, the following events also transpired:

(1) IFF (U.S.) notified FNCB that it had sold its contract with FNCB to Amsterdam.

(2) Amsterdam notified FNCB that it had bought the contract. It agreed to assume liability thereunder if FNCB would confirm its intent to pay the sum of $3,046,010 upon the delivery of 1.1 million pounds sterling on January 3, 1968.

(3) At 4:18 p.m., Amsterdam received notification from FNCB of its approval of Amsterdam's purchase of the contract. FNCB also confirmed that on January 3, 1968, it would credit the dollar account of Amsterdam with the difference between its own obligation under the contract, $3,046,010, and the dollar cost to Amsterdam of purchasing from FNCB, at the prevailing rate of exchange, the 1.1 million pounds sterling needed to close out the contract on such date.

(4) At 4:30 p.m., Amsterdam purchased 1.1 million pounds sterling at the rate of $2.4080 from FNCB for delivery on January 3, 1968.

On December 21, 1967, Amsterdam sent a check to IFF (U.S.) in the amount of $387,000 representing the price agreed upon for the purchase of the contract. On January 3, 1968, Amsterdam closed out the contract with the 1.1 million pounds sterling purchased short from FNCB on December 20, 1967. The net gain to Amsterdam on the transaction was $10,210.

In 1967, IFF (G.B.) paid the dollar equivalent of $476,000 in dividends to IFF (Holland). In the same year, IFF (U.S.) received the dollar equivalent of $1,421,136 in dividends from IFF (Holland).

With respect to IFF (G.B.), its assets and liabilities per books, stated in British pounds sterling, for the years 1966–68 were as follows:

IFF (G.B.) Comparative Balance Sheet 1966–68

| | 1966 | 1967 | 1968 |
|---|---|---|---|
| Current assets: | | | |
| Cash on hand | $2,191 | $7,439 | $2,389 |
| Marketable securities | | 135,000 | 40,000 |
| Notes receivable—trade | 9,155 | 12,182 | 7,718 |
| Accounts receivable—trade and affiliate and other | 433,433 | 571,521 | 1,022,208 |
| Allowance for bad debts | (11,818) | (13,805) | (15,451) |
| Inventories | 522,699 | 578,774 | 734,195 |
| Prepaid expenses and deferred charges | 19,369 | 19,973 | 21,927 |
| Total current assets | 975,029 | 1,311,084 | 1,812,986 |
| Other assets: | | | |
| Loans to employees—long term | 25,561 | 20,143 | 2,497 |
| Fixed assets | 752,257 | 840,863 | 1,096,963 |
| Less: Accumulated depreciation | (248,334) | (284,885) | (327,093) |
| Total current and other assets | 1,504,513 | 1,887,205 | 2,585,353 |
| Current liabilities: | | | |
| Notes payable—short term | | | 95,958 |
| Accounts payable—trade and affiliate | 120,826 | 209,443 | 236,551 |
| Taxes withheld from employees | 5,807 | 6,177 | 8,026 |
| Other accounts payable and accrued expenses | 35,099 | 38,474 | 28,788 |
| Accrued taxes on income | 292,632 | 336,309 | 540,389 |
| Total current liabilities | 454,364 | 590,403 | 909,712 |
| Long-term liabilities: | | | |
| Reserves for retirement benefits and pensions | 4,607 | 4,690 | 8,690 |
| Deferred taxes on income | 33,508 | 42,952 | 91,138 |
| Total current and long-term liabilities | 492,479 | 638,045 | 1,009,540 |
| Excess of assets over liabilities | 1,012,034 | 1,249,160 | 1,575,813 |
| Shareholders equity: | | | |
| Capital stock issued and outstanding | 250,000 | 250,000 | 250,000 |
| Retained earnings | 762,034 | 999,160 | 1,325,813 |
| Total shareholder equity | 1,012,034 | 1,249,160 | 1,575,813 |

The reconciliation of retained earnings of IFF (G.B.) per books, stated in British pounds sterling, for such years was as follows:

| | |
|---|---:|
| Retained earnings 12/31/65 | $652,393 |
| Net income for year 1966 | 329,641 |
| Total | 982,034 |
| Less: Dividends declared | 220,000 |
| Retained earnings 12/31/66 | 762,034 |
| Retained earnings 12/31/66 | 762,034 |
| Net income for year 1967 | 407,126 |
| Total | 1,169,160 |
| Less: Dividends declared | 170,000 |
| Retained earnings 12/31/67 | 999,160 |
| Retained earnings 12/31/67 | 999,160 |
| Net income for year 1968 | 517,442 |
| Total | 1,516,602 |
| Less: Dividends declared | 190,789 |
| Retained earnings 12/31/68 | 1,325,813 |

During each of the years 1965, 1966, and 1967, IFF (G.B.) purchased $559,538, $626,850, and $855,113 worth of raw materials from IFF (U.S.), respectively. The billings were made in dollars and as of December 31, 1967, there was an unpaid balance of $175,632. Correspondingly, IFF (U.S.) incurred obligations in pounds sterling of 15,888-0-8, 13,348-15-1, and 11,127-19-1 on account of various raw materials purchased from and services rendered by IFF (G.B.) in each of such years.

IFF (G.B.) also owed certain dollar amounts pursuant to an agreement entered into with IFF (U.S.) on January 1, 1963. In substance, the agreement provided a formula by which IFF (G.B.) was to share the cost of making certain management services of key personnel from IFF (U.S.) and its foreign affiliates, including IFF (G.B.), available to the affiliated group on an international basis. It also set forth the basis on which IFF (G.B.) would share in certain research expenses incurred by IFF (U.S.) and IFF (Holland) from which it derived some benefit. The net dollar amounts owed under such agreement were as follows:

| | 1965 | 1966 | 1967 |
|---|---:|---:|---:|
| International management group expense | $65,090 | $164,162 | $172,777 |
| Share of group basic flavor research expense | 47,874 | 63,192 | 90,800 |
| Net share of basic aromatic chemicals research expense | 84,635 | 128,769 | 177,336 |
| Total | 197,599 | 356,123 | 440,913 |

The billings under the agreement were made quarterly. The balance due for the last quarter of 1966 was $81,467, while the balance for the last quarter of 1967, during which the pound was devalued, was $119,304.

Except as described above, no other obligations were incurred between the parties during the period of 1965–68.

In addition to the transaction in question, the petitioner made short sales of British pounds sterling in 1967 and 1968 with respect to which losses were sustained. In the determination of its tax liabilities for those years, such losses were deducted as ordinary losses.

On it corporate return for the taxable year 1967, IFF (U.S.) reported the $387,000 gain realized from the purported sale of its contract with FNCB as long-term capital gain. The respondent asserted deficiencies for such year on the basis that IFF (U.S.)'s sale of the contract to Amsterdam was a sham and the gain therefrom should have been reported as short term. In the alternative, he asserted the short sale was a hedging transaction and the gain should have been taxable as ordinary income.

## OPINION

The petitioner both directly and indirectly through its foreign affiliates was engaged worldwide in the preparation and distribution of flavoring extracts. During the latter part of 1966, the petitioner became concerned that a devaluation of the English pound sterling would adversely affect, at least on paper, petitioner's investment in its second-tier subsidiary, IFF (G.B.), which was organized and operated in the United Kingdom. In an effort to protect against that risk, petitioner entered into a short sale contract with FNCB on December 29, 1966, whereby it sold 1.1 million British pounds sterling at the rate of $2.7691 per pound for delivery on January 3, 1968.

On November 18, 1967, of the succeeding year, the pound was devalued in terms of the U.S. dollar from $2.80 to $2.40.

On December 20, 1967, only a few days prior to the closing date of the contract, petitioner purported to sell its contract to Amsterdam for $387,000, treating such amount as long-term capital gain from the sale of a capital asset held for more than 6 months. That same day Amsterdam made an offsetting purchase of the 1.1 million pounds sterling from FNCB at the current exchange rate of $2.4080, delivery set for January 3, 1968.

On January 3, 1968, both contracts were closed out with Amsterdam realizing a net gain of $10,210 on the transaction.

At the outset, the Court is faced with the question whether, on the basis of the facts in this case, either the contract entitling the petitioner to sell to FNCB 1.1 million pounds sterling on January 3, 1968,

or the subject of that contract, i.e., pounds sterling, constituted a "capital asset" in the hands of the petitioner within the meaning of section 1221. Foreign currency is recognized as "property" as that term is used in the internal revenue laws. Such property meets the literal definition of a capital asset as set forth in section 1221.[2] However, the respondent contends that petitioner's transactions in foreign currency come within the exception to a literal reading of the statute which was carved out under the decision in *Corn Products Co.* v. *Commissioner, supra,* and the innumerable cases which followed. See *Chemplast, Inc.,* 60 T.C. 623 (1973).

In response to this argument, petitioner points to the ostensible basis upon which it decided to enter into the short sale contract, namely, as suggested in an internal memorandum, to offset a possible write-down of the net current assets of IFF (G.B.) in preparing the annual consolidated statements of the petitioner and its affiliated corporations in the event of the devaluation of the pound sterling. The amount of pounds sterling to be sold short was supposed to have been calculated with that in mind.

In determining the effect of the short sale with respect to petitioner's business, this Court is not prepared to accept that memorandum as controlling.[3] Rather, we must look to the facts. Any diminution in value of the assets of IFF (G.B.) as measured in pounds sterling would be offset by a corresponding reduction in its liabilities, which

---

[2] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

[3] It should be noted that for accounting purposes the transaction whereby the petitioner realized a gain on the short sale of pounds sterling would have no effect on the consolidated balance sheet except as reflected in the computation of earnings and profits. The petitioner merely realized a nonrecurring gain.

likewise were payable in pounds sterling. The only loss that the petitioner could sustain was the loss on the conversion into U.S. dollars of the earnings and profits of its British affiliate and, secondly, the loss in U.S. dollars on account of its investment, if any, in the capital stock of such corporation. So long as IFF (G.B.) stayed in business, the latter would never be realized. All the petitioner really accomplished by the short sale of the pounds sterling was to recoup an amount equivalent to the ultimate losses in earnings which might be sustained when and if the pounds sterling earned by its British affiliate were remitted to the petitioner and converted into U.S. dollars.[4]

In this case, the business of IFF (G.B.) was the business of the petitioner. The loss which the petitioner sought to offset by the short sale of pounds sterling was a loss to which its British affiliate was exposed in its everyday business. Purchases and sales of foreign currency, which in terms of the Internal Revenue Code must be considered as property other than money, for the purpose of offsetting losses which might result from fluctuations in the exchange rates, are part and parcel of a multinational business. If the petitioner had conducted its foreign business in the United Kingdom through a branch of the parent corporation rather than a British subsidiary, applicability of the *Corn Products* doctrine to such transaction in foreign exchange could hardly be questioned. The fact that a U.S. corporation conducts its foreign business through foreign subsidiaries rather than branches, does not necessarily warrant applicability of a different rule. See, e.g., *Schlumberger Technology Corp.* v. *United States*, 443 F. 2d 1115 (C.A. 5, 1971).[5]

The short sale of pounds sterling by the petitioner must be regarded as an ordinary income-related transaction and not an "investment." It constituted a loose "hedge" against the risk of future losses of income. See *Wool Distributing Corporation*, 34 T.C. 323 (1960). If petitioner in this case had closed out its short sale of British pounds in accordance with its contract with FNCB by purchasing pounds at the lower rate resulting from the devaluation, the resulting gain would have been taxable as ordinary income. *Wool Distributing Corporation*, *supra*; *America-Southeast Asia Co.*, 26 T.C. 198 (1956). See also *Corn*

---

[4] For tax purposes, any adjustment on account of the devaluation of the pound sterling would be limited to the pounds sterling which might ultimately be remitted to the petitioner. See G.C.M. 4954, VII-2 C.B. 293; cf. Methods of adjustment with respect to branches, O.D. 489, 2 C.B. 60, and O.D. 550, 2 C.B. 61.

[5] The decision with respect to the applicability of the *Corn Products* doctrine in the *Schlumberger* case may appear to be in conflict with a prior decision of the Court of Claims in *KVP Sutherland Paper Co.* v. *United States*, 344 F. 2d 377 (Ct. Cl. 1965), in that the Court of Claims there found that the loan in Canadian currency by the taxpayer to its subsidiary and the subsequent repayment thereof in kind was a "capital transaction." However, since that court proceeded to tax the gain realized at each step of the transaction either as ordinary income or as a short-term capital gain, the net result was the same.

*Products Co.* v. *Commissioner*, *supra*; *Commissioner* v. *Farmers &
G C. Oil Co.*, 120 F. 2d 772 (C.A. 5, 1941), reversing 41 B.T.A. 1083
(1940), certiorari denied 314 U.S. 683 (1941). The fact that peti-
tioner chose to sell the contract instead does not change the character
of the transaction.

In view of our decision with respect to the applicability of the *Corn
Products* doctrine, it is not necessary to decide the alternative ques-
tion whether the petitioner has met its burden of proving that the
transaction between the petitioner, Amsterdam, and FNCB was not in
substance a purchase by the petitioner of pounds sterling to meet its
obligation under the short sale, thereby making the gain taxable under
the provisions of section 1233. In view of the sequence of events, how-
ever, it is clear that Amsterdam did not intend to assume any risk. In
the absence of any testimony from the representatives of Amsterdam,
suffice it to say that its role appears to be more nearly that of the
broker than a purchaser. Cf. *Frank C. LaGrange*, 26 T.C. 191 (1956).

Reviewed by the Court.

*Decision will be entered under Rule 155.*

---

TANNENWALD, *J.*, concurring: I agree with the result reached by
the majority, but on a different basis, namely, that petitioner realized
a short-term capital gain. In so concluding, I eschew issues relating to
the reaches of the "integral part of the business" doctrine upon which
*Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955), is founded
and to the applicability of section 1233, either directly or by analogy,
to transactions of the type involved herein.[1] Rather, I rest my con-
clusion upon the factual basis that Amsterdam was in reality acting
on behalf of petitioner in contracting to purchase pounds from the
First National City Bank, that, in effect, such contract to purchase was
used to close IFF's short position with First National City Bank on
December 20, 1967, with the result that IFF became absolutely entitled
to payment of the amount of the difference between $2.7691 and $2.4080
per pound, and that such amount represented short-term capital gain
to IFF, the assignment of which to Amsterdam did not divest IFF
of liability for tax on such gain.

My conclusion is founded upon a careful analysis of the facts re-
vealed—or, to put it more correctly, not revealed—by the record herein,
in light of the well-established principle that the taxpayer has the
burden of proof. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *Albino* v.
*Commissioner*, 273 F. 2d 450 (C.A. 2, 1960), affirming per curiam T.C.

---

[1] See also Duncan, "Lowering the Value of the Dollar Raises Certain Tax Problems,"
37 J. Taxation 115 (1972).

Memo. 1959–1; Rule 142, Tax Court Rules of Practice and Procedure. The contract to purchase pounds between Amsterdam and First National City Bank, the notifications by IFF and Amsterdam to First National City Bank of Amsterdam's "purchase" of the 1966 contract between IFF and First National City Bank, and the acknowledgement of First National City Bank to Amsterdam are all dated the same day, namely, December 20, 1967. The acknowledgement by First National City Bank to Amsterdam is very revealing. I quote it in full:

In reply to your letter of December 20, 1967, this is to confirm that we have agreed to your purchase from International Flavors and Fragrances Inc. their contract with us wherein they have sold to us on December 29, 1966 Pounds Sterling 1,100,000–0–0 for delivery on January 3, 1968 at the rate of $2.7691 per Pound. We also wish to confirm that we shall credit your Dollar Account with us on January 3, 1968 the dollar difference between our original purchase price of $2.7691 per Pound and the rate of exchange applied to your purchase from us of Pounds Sterling 1,100,000–0–0 to close this contract out.

We have also received a letter from International Flavors and Fragrances Inc. confirming their sale of this contract to you.

Awaiting your further instructions in connection with closing out this contract.

A longhand notation to this letter reads as follows: "bt. Ls1,100,000 forward 1/3/68 at 2.4080 12/20/67 4:30 p.m."

The only evidence as to the foregoing documents relates to the source of the three documents which set forth the arrangements between First National City Bank and Amsterdam, namely, that they came from the files of the bank. The record is totally silent as to the extent of IFF's knowledge, if any, of the arrangements. The only witness was IFF's comptroller, who was not employed by IFF until 1970 (long after the transactions involved herein occurred) and therefore was not competent to testify as to such knowledge. Under these circumstances, I cannot conclude, as petitioner, who has the burden of proof, would have us do, that "No arrangement was made between IFF and Amsterdam to purchase pounds to close the short sale." Indeed, given the clear confirmation in the letter from First National City Bank to Amsterdam with respect to the crediting of the latter's purchase obligation, I think it reasonable to infer that the existence of Amsterdam's contract to purchase pounds was a precondition of the purported acquisition of the short sale contract from IFF and that an immediate offset of the two obligations was intended with the crediting of the differential in price on January 3, 1968, the only act remaining to be performed.[2]

---

[2] It makes no difference, for the purpose of this case, whether we view the transaction as an accrual in 1967 in favor of IFF (an accrual-basis taxpayer) of a short-term capital gain deriving from the right to receive $397,000 as a result of the transfer of the contract to purchase pounds to the First National City Bank in exchange for the termination of the short sale obligation plus the right to receive cash followed by the immediate sale of that right for $387,000, giving rise to a short-term capital loss of $10,000, or the anticipatory assignment by IFF of a fixed, although not technically "accrued," right to receive the profit from the closing of the short sale for $387,000.

The cases relied upon by petitioner, dealing with the assignment of anticipated profit from the transfer of preferred stock, bonds, or notes to the issuing corporation, are distinguishable. In those cases, the right to receive the profit was close—indeed, very close—to fruition, but had not yet become a fixed legal right to receive payment. *Stanley D. Beard*, 4 T.C. 756 (1945); *W. P. Hobby*, 2 T.C. 980 (1943); *Clara M. Tully Trust*, 1 T.C. 611 (1943); *John D. McKee, Et Al., Trustees*, 35 B.T.A. 239 (1937). See also *Conrad N. Hilton*, 13 T.C. 623 (1949). The "near but yet so far" distinction upon which such decisions are posited stands sharply revealed when considered in light of the authorities which hold that a taxpayer cannot divest himself of capital gain to which he has become entitled as a result of an irreversible corporate liquidation or sale of stock. *Kinsey* v. *Commissioner*, 477 F. 2d 1058 (C.A. 2, 1973), affirming 58 T.C. 259 (1972); *Hudspeth* v. *United States*, 471 F. 2d 275 (C.A. 8, 1972); *Rollins* v. *United States*, 302 F. Supp. 812 (W.D. Tex. 1969); *Stephen S. Townsend*, 37 T.C. 830 (1962). Compare *Simmons* v. *United States*, 341 F. Supp. 947 (M.D. Ga. 1972); *W. B. Rushing*, 52 T.C. 888, 896–898 (1969), affd. 441 F. 2d 593 (C.A. 5, 1971).

Nor is petitioner helped by such cases as *Joseph Maloney*, 25 T.C. 1219 (1956), *Morris Shanis*, 19 T.C. 641 (1953), affirmed per curiam 213 F. 2d 151 (C.A. 3, 1954), and *Pacific Affiliate, Inc.*, 18 T.C. 1175, 1221 (1952), affirmed per curiam 224 F. 2d 578 (C.A. 9, 1955). In those cases, the subject matter was of a nonmonetary character, and the purchase and sale transactions were treated separately by the parties and were consummated through public stock or commodity exchanges. Additionally, with the possible exception of *Shanis*, the purchase and sale arrangements were between the taxpayer and different parties. Lack of identity of parties also existed in *Frank C. LaGrange*, 26 T.C. 191 (1956). Given the foregoing complicating elements, offsetting was either impossible or considered inappropriate.[3] No such obstacles to immediate offsetting exist herein. In this case, the transactions were privately arranged and consummated, and the First National City Bank was a party to both the sale contract and the purchase contract (acquired at the same time as the transaction between IFF and Amsterdam occurred) and treated the two contracts as offsetting items with, for aught that appears in the record herein, IFF's knowledge and participation.[4] These critical facts distinguish the instant situation from that which might have obtained if the record had revealed that IFF simply sold its short sale contract, leaving it to the subsequent exercise

---

[3] Lack of identity of parties made it necessary for this Court, in *LaGrange*, to articulate its decision in terms of the continued liability of the taxpayer in order to find the necessary agency relationship, a distinguishing factor upon which petitioner heavily relies.

[4] As a consequence, the absence of continued liability by IFF becomes totally irrelevant. See fn. 3 *supra*.

by Amsterdam of its discretion whether to resell it, buy pounds in anticipation of closing it, or do neither in the hope that a change in the exchange rate would increase its profits.[5] In this connection, I am constrained to note that the opportunity for offsetting, which I consider to have existed in the instant case, would not necessarily have been avoided if Amsterdam had contracted to purchase the pounds from a source other than First National City Bank; in such a situation, it would still be pertinent to inquire as to the involvement of First National City Bank in order to determine whether a circuitous form of transaction was utilized to camouflage the application of the offset rationale.

Finally, I consider inapposite *Stavisky v. Commissioner*, 291 F. 2d 48 (C.A. 2, 1961), affirming 34 T.C. 140 (1960), also cited by petitioner to support its position. There, to be sure, there were two "when, as, and if issued" transactions—one a sale and the other a purchase—between the taxpayer and the same person. But these two transactions occurred practically simultaneously at the very outset [6] and they were treated separately by the parties involved, including disposition in two different taxable years. More importantly, the issue in that case was framed in terms of whether a payment by the taxpayer upon the transfer of the contract of sale was an ordinary loss or a capital loss—an issue which turned upon whether the taxpayer had made a sale or a payment in exchange for a cancellation of a liability. After finding that section 117(1) of the Internal Revenue Code of 1939 (the predecessor of section 1233) was inapplicable because the transactions occurred prior to its enactment, this Court held that all that had been sold was the "when, as, and if issued" sale contract which had been held for more than 6 months. Indeed, the rejection of the taxpayer's claim for an ordinary loss, based upon its release from liability by the other party to that contract, coupled with the fact that the taxpayer did not, at that time, transfer the "when, as, and if issued" purchase contract, lends support to treatment of the facts in this case as a transfer of a capital asset by IFF, namely, the offsetting contract to purchase pounds—an asset which had clearly been held only momentarily. See fn. 2 *supra; Raymond B. Haynes*, 17 T.C. 772, 777 fn. 2 (1951). Compare *KVP Sutherland Paper Co. v. United States*, 344 F. 2d 377, 383 (Ct. Cl. 1965); *Loewi & Co.*, 23 T.C. 486, 489–490 (1954), affirmed on other grounds 232 F. 2d 621 (C.A. 7, 1956). See also Skelton, *J.*, concurring in *Gillin v. United States*, 423 F. 2d 309, 314–316 (Ct. Cl. 1970).

GOFFE and WILES, *JJ.*, agree with this concurring opinion.

---

[5] By virtue of the purchase of the same amount of pounds at $2.4080 per pound, any subsequent fluctuation in the value of the pound was totally without effect upon the amounts to be received or paid by IFF, Amsterdam, or First National City Bank.

[6] Under such circumstances, they were akin to "arbitrage." Cf. sec. 1233(f).

HALL, *J.* I respectfully dissent, believing the gain to be long-term capital gain.

Fearing diminution of the dollar value of its stock in its British subsidiary in the event of devaluation of the pound, petitioner acquired by contract the right to sell to City Bank 1,100,000 pounds at $2.7691 per pound. This contract right, I believe, was a capital asset. It clearly is not excluded from the definition of that term under the literal language of section 1221(1). Although respondent asserts, and the Court holds, that the contract is caught within the sweep of the *Corn Products* doctrine, this cannot be so. *Corn Products* teaches that capital gain treatment is reserved for "transactions in property which are not the normal source of business income." 350 U.S. 46, 52 (1955). The contract here and the property (pounds) were clearly not the normal source of petitioner's business income. There is no indication that the transaction was recurring. As such, it was unlike that in *Corn Products*. Intended, as the majority finds it was, to offset possible anticipated decline in the dollar value of the sterling subsidiary's stock, the transaction was more closely related to that stock, a capital asset in petitioner's hands, than to the subsidiary's routine business operations. While the majority refers to currency hedges as "part and parcel of a multinational business," there is no evidence that this transaction was routine or customary for petitioner. Furthermore, nothing in the evidence or findings justifies us in ignoring the separate corporate identities of petitioner and its subsidiary. The business of the subsidiary was not that of the parent. *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949); *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943).

Since the contract was a capital asset, concededly held for more than 6 months, long-term capital gain treatment was appropriate if the disposition of the contract on December 20, 1967, constituted a sale. Sec. 1222(3), I.R.C. 1954. On this issue I respectfully disagree with the concurring opinion. After the devaluation the contract right to sell pounds for more than their value was a valuable and readily marketable asset. No shenanigans or special deals were required to sell it, and we have no evidence either occurred. While the purchaser, Amsterdam, froze its profits by simultaneously hedging, there is no reason this circumstance should convert petitioner's sale into something else. Petitioner clearly divested itself of all title to, and realistic further concern regarding, the contract, and became unconditionally entitled to the price. No more is required for a "sale," which has the same meaning in tax law as in ordinary parlance. *Commissioner* v. *Brown*, 380 U.S. 563 (1965); *Helvering* v. *Flaccus Leather Co.*, 313 U.S. 247 (1941). Petitioner's failure to prove its lack of knowledge of what Amsterdam planned to do with the contract is immaterial, for such

knowledge could not add to or subtract from the finality of petitioner's disposition. The concurring opinion also refers to petitioner's failure to prove absence of "participation" in the Amsterdam-City Bank arrangement, but the record is clear enough to support, indeed to require, the Court finding as a fact that the participants in that transaction were Amsterdam and First National City Bank. Moreover, petitioner could properly claim unfair surprise if taxed with the concurring opinion's theory that it failed to disprove that Amsterdam acted as petitioner's agent. Respondent's counsel, in his opening statement, admitted that "IFF transferred its agreement with First National City Bank to Amsterdam Overseas Corporation for $387,000." This admission, while in effect belatedly retracted by respondent's advancing a new theory at a second trial session, is quite inconsistent with any notion of IFF's subsequent retention of ownership. Accordingly, I would find that a sale took place and the gain was long-term capital gain. See *Conrad N. Hilton*, 13 T.C. 623 (1949); *Stanley D. Beard*, 4 T.C. 756 (1945); *Clara M. Tully Trust*, 1 T.C. 611 (1943).

FORRESTER and STERRETT, *JJ.*, agree with this dissent.