**Willard W. ROLLINS and Lee Edward Rollins, Independent Executors of the Estate of Lillian Irene Rollins, deceased, and Willard W. Rollins, Individually,**

v.

**UNITED STATES of America.**

**Civ. A. No. 68–162 SA.**

United States District Court
W. D. Texas.

May 7, 1969.

William E. Schmidt, Dodson, Duke & Branch, San Antonio, Tex., for plaintiffs.

Johnnie M. Walters, Asst. Atty. Gen., John O. Jones, and William W. Guild, Attys., Tax Division, Dept. of Justice, Fort Worth, Tex., and Ted Butler, U. S. Atty., San Antonio, Tex., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT, CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

In this suit, which was tried to the Court, plaintiffs seek to recover income taxes paid by Willard W. Rollins and his wife, Lillian, now deceased, for the taxable year 1964. Since the interest of Lillian Rollins arose only by reason of the fact that she filed a joint return with her husband, for the purpose of this opinion, the interested taxpayer is Willard W. Rollins, and plaintiffs will hereafter be referred to collectively, as "Rollins".

Briefly stated, the controversy between the parties arises from Rollins' gift of 3,000 shares of common stock in Handy-Andy, Inc., to two charitable institutions, the Mexican Baptist Bible Institute, hereafter referred to as "Bible Institute", and Mary Hardin-Baylor College, hereafter referred to as "Baylor College". There is no dispute whatsoever about the charitable nature of the gift, or of the actual market value of the shares, and Rollins has been allowed his full charitable deduction of $105,000.00 for the taxable year, 1964. The deficiency assessment in question was made upon a finding by the Internal Revenue Service, that under the circumstances which surrounded transactions between Rollins, the charities, and one Charles Lee Becker, Rollins made a sale of this stock, that he realized income from that sale to the extent that the selling price exceeded the basic value of the shares, and that he was therefore liable for a 25% capital gain tax upon income of $74,000. (Fair market value of stock, $105,000, less basis of $31,000). The $18,500.00 deficiency assessment now in question, represents that 25% tax and Rollins also seeks to recover the further sum of $2,590.08 paid as interest upon this assessment.

After due consideration of the testimony, exhibits, stipulations and briefs of the parties, the Court hereby enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Willard W. Rollins and his wife, Lillian Rollins, timely filed their federal income tax return for the calendar year 1964 with the District Director of Internal Revenue at Austin, Texas.

2. The Commissioner of Internal Revenue, acting through the District Director, assessed and collected additional income taxes from Willard W. Rollins and his wife for the taxable year, 1964. In particular, the District Director assessed and collected the sum of $18,500.-00, plus interest of $2,590.08, which represented a 25% taxation upon a capital gain of $74,000 realized from sale of 3,000 shares of Common stock of Handy-Andy, Inc.

3. On August 16, 1967, Willard W. Rollins and his wife paid the additional income taxes and interest so assessed.

4. On or about August 25, 1967, Rollins filed proper and lawful claim for refund of the additional income taxes with the District Director of Internal Revenue, Austin, Texas.

5. The claim for refund for the year 1964 was finally disallowed by the defendant by letter dated December 15, 1967, received by Rollins on December 18, 1967.

6. A period of more than six months elapsed between the filing of the aforesaid claim for refund and the filing of the complaint in this action, and not more than two years elapsed between the time of the final notice of disallowance and the filing of the complaint in this action.

7. On April 8, 1968, Lillian Rollins died, and Willard W. Rollins and Lee Edward Rollins were appointed independent executors of her estate, pursuant to letters testamentary issued by the Probate Court of Bexar County, Texas.

8. In 1964, Willard W. Rollins and his wife, Lillian, owned or had control of 27,490 shares of common stock of Handy-Andy, Inc. They, together with E. C. Becker, Lee Rollins, and W. R. Stevens, owned controlling interest in the corporation, their interest totalling 97,486 shares.

One Charles Lee Becker, the son of the original founder of the "Handy-Andy" stores, owned a minority share of the stock, his interest totalling 67,540 shares in the corporation.

9. In 1964, Handy-Andy, Inc. was a closely held corporation. It owned and operated a chain of some 25 grocery stores in three Texas cities, and its stock was not sold on the open market. The "Rollins group" controlled approximately 40% of the stock, Charles Becker approximately 33⅓%. Remaining shares

were held by others, principally a charitable foundation established by the corporation, and a profit sharing trust set up for employees of the corporation. In the past, few sales had been made, and these were principally transactions between the corporate Treasury and employees. Such sales were made at a price of $7.00 or $8.00 per share. (Test. W. R. Stevens, Treasurer-Comptroller). The book value of the corporate stock was $18.00 per share. (Test. Charles Becker).

For many years dividends of 25 cents per share had been paid. From 1960–1964, approximately, dividends at the rate of 50 cents per share were paid. (Test. Stevens).

10. Early in 1964, considerable conflict arose between the "Rollins group" and Charles Lee Becker, the minority stockholder, and the parties realized that they could no longer continue their close association in the operation of the corporation. Negotiations which continued over a period of several months, concluded in a "buy and sell" agreement or proposal signed by the parties on May 25, 1964. (Pltf. Ex. 5).

11. Under the proposal of May 25, 1964, stockholders E. C. Becker, Willard W. Rollins, Lee Rollins, and W. R. Stevens, representing the majority interest, gave Charles Lee Becker the election of either buying all of the shares of the majority group, or of selling all of his shares to that group. In either event, the agreed price per share was set at $35.00.

12. In the proposal, the stock interests of all parties was set out specifically and incorporated in the Agreement, to-wit:

|  | Class A | Class B | Total |
|---|---|---|---|
| E. C. BECKER | 21,792 | 15,696 | 37,488 |
| W. W. ROLLINS | 7,132 | 20,358 | 27,490 |
| LEE E. ROLLINS | 3,428 | 12,020 | 15,448 |
| W. R. STEVENS | 3,040 | 14,020 | 17,060 |
| Total, majority stockholders | 35,392 | 62,094 | 97,486 |
| CHARLES LEE BECKER, Minority Interest | 29,088 | 38,452 | 67,540 |

The "Class B" common stock listed above, was non-voting stock.

13. The proposal was worked out by the majority stockholders, and was presented to Charles Lee Becker at approximately 2:00 p.m. on May 25, 1964 at the office of a named Escrow Agent, Charles W. Duke. Under the terms of the proposal, Charles Lee Becker was required to notify the Escrow Agent, in writing by 6:00 p.m. on May 25th as to his decision to either buy the interests of the majority group, or to sell his interest to that group.

In the event Charles Lee Becker elected to buy the shares of the majority group, he was required to deposit 5% of the total purchase price as earnest money to bind the contract, within a period of 72 hours after 6:00 p.m. May 25th, and the remainder of the purchase price was to be paid on or before 10:00 a.m., October 1, 1964. In such event, the majority group was to deliver all of their shares, including shares controlled by them, prior to the closing date, for delivery to Charles Lee Becker upon payment of the purchase price.

In the event Charles Lee Becker elected to sell all of his stock, then the majority group was required to deposit a 5% sum of earnest money within a 72-

hour period, with balance to be paid on or before October 1st, and Charles Lee Becker was required to deposit all of his shares with the Escrow Agent before that date.

14. In the event any party defaulted in payment of the full purchase price, the 5% payment of earnest money was forfeited, to be retained as liquidated damages.

15. It was further provided that the selling parties, as the case might be, would remain on the payroll of Handy-Andy, Inc., in their various capacities, until April 30, 1966, and all parties further agreed that the seller, or the sellers of stock would not compete in the grocery or super market food business in three Texas counties for a period of 10 years.

16. Paragraph 6 of the proposal provided that when the proposal was accepted by Charles Lee Becker, by signature, the agreement became a contract of purchase and sale.

17. Charles Lee Becker accepted the terms of the proposal, by affixing his signature to the same at 2:25 p.m. on May 25, 1964.

18. At 5:48 p.m. on May 25, 1964, Charles Lee Becker notified the Escrow Agent, in writing, that he elected to buy all of the common stock of Handy-Andy, Inc., owned and controlled by the majority stockholders.

19. On May 26, 1964, Charles L. Becker deposited with the Escrow Agent the sum of $170,600.50, representing 5% of the total purchase price of $3,412,010.

20. Willard W. Rollins is a gentleman with deep religious convictions. He has been a member of the Riverside Baptist Church in San Antonio, Texas, for over 60 years, and he has tithed 10% of his income for over 50 years. In addition, he has made offerings and gifts to his church, the Mexican Bible Institute, and at one time, a gift of $10,000 to Baylor College. In June, 1964, he was a Trustee of Baylor College.

21. Although the balance of the purchase price for the stock was to be paid by October 1, 1964, Charles Lee Becker was successful in securing financing for the purchase prior to that time, and on June 29, 1964, the sale was formally closed. Some time prior to that date, and after May 25, 1964, Willard Rollins determined that he wished to make gifts to the Bible Institute and Baylor College. Approximately one week prior to June 29, Rollins called Reverend Widemann, a Trustee of the Bible Institute and informed him that he would give the Bible Institute some stock to help build a new dormitory. At approximately the same time, Rollins informed Baylor College that he would donate 1500 shares of Handy-Andy Class B common stock to that Institution.

22. On June 26, 1964, Baylor College authorized Rollins to sell the 1500 shares of Class B common stock on behalf of the College. (Pltf. Ex. 6).

23. Reverend Widemann, of the Bible Institute, picked up the Institute's stock certificate at the office of Handy-Andy on the morning of June 29, 1964, and took it to his bank for collection. Rev. Widemann was not acquainted with Charles Lee Becker, and had no knowledge of the agreement between Rollins and Becker. At the time the certificate was delivered, Rollins informed him that Charles Becker would pay $35.00 per share for the stock, but Rollins did not tell him that the stock would have to be sold to Becker. Rev. Widemann was interested in getting the best possible price for the stock, and he had been informed by others that the stock would not sell over the counter for $35.00.

24. The stock transfer records of Handy-Andy, Inc., show the following transfers on June 29, 1964:

a) A certificate (No. 60), representing 1,000 Class B shares held by Rollins, was transferred to the Mexican Baptist Bible Institute.

b) A certificate (No. 605) representing 3,000 Class B shares held by Rollins was transferred as follows: 500 shares to the Mexican Baptist Bible Institute, 1500 shares to Mary

Hardin-Baylor College, and 1,000 shares to Rollins under a new certificate.

c) On June 29, 1964, the 1500 shares in the name of the Bible Institute and the 1500 shares in the name of Baylor College, as well as all the other shares held by the majority group, Willard Rollins, E. C. Becker, Lee Rollins, and W. R. Stevens, were transferred to Charles Lee Becker.

25. On June 29, 1964, Charles Lee Becker paid the full purchase price for shares of stock so transferred to him, and on that date, cashier checks each in the amount of $52,477.51 were paid to Baylor College and to the Bible Institute, respectively, in acknowledgement of their transfers of stock to Charles Lee Becker.

26. The price of $35.00 per share received by Baylor College and the Bible Institute was the amount agreed to by the parties for the purpose of the proposal and sales contract of May 25, 1964. At the time of the contract, the stock of Handy-Andy, Inc. was selling at $7.00 per share if there was stock to sell or a buyer to buy.

### CONCLUSIONS OF LAW

As stated at the outset, Rollins was allowed a charitable deduction in the amount of $105,000, which was the full, fair market value of the 3,000 shares of Class B stock, which was placed in the names of the two charitable institutions. He failed, however, to report a capital gain of $74,000, which was the increment in value, over and above Rollins' basis in the stock of $31,000. If it be determined that the two charitable institutions realized the gain, then for all practical purposes the $74,000 increment in value will escape taxation. Thus, the sole question before the Court is whether, in substance, the gain from sale of the stock should be attributed to Rollins.

Section 61 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 61 provides:

"§ 61. *Gross Income Defined*

(a) *General Definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\*    \*    \*    \*    \*    \*

(3) Gains derived from dealings in property;

\*    \*    \*    \*    \*    \*

The language of this statute which defines taxable income in the broadest tones, illustrates Congress' intention "to exert the full measure of its taxing power over all realized gains." Blassie v. C. I. R. (8th Cir.1968) 394 F.2d 628, 630.

The determination of the taxable event is to be determined by substance, and not by the form of the transaction in question.

In Commissioner of Int. Rev. v. Court Holding Co. (1945) 324 U.S. 331, 65 S. Ct. 707, 89 L.Ed. 981, the corporate owner of an apartment house negotiated with a third party for sale of the property, which was the sole corporate asset. Thereafter the corporation was dissolved, and title to the property was deeded to the two stockholders, who thereafter conveyed title to the third party. The Court held that the corporation was taxable for the gain which accrued from the sale, stating at p. 334, 324 U.S., at p. 708, 65 S.Ct., at p. 985, 89 L.Ed.:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously

impair the effective administration of the tax policies of Congress."

When an individual, by virtue of his own efforts, has earned the right to income, or otherwise exercises dominion and control over its disposition, he is liable for taxation of such income, even though he does not actually receive the proceeds. Actual receipt of income is not the only way that income can be "realized" for purposes of the tax laws, and an anticipatory assignment of income which a taxpayer is about to receive does not prevent the gain from being taxable to him. "[I]ncome is to be taxed to the one who earns it or otherwise creates the right to receive it and to enjoy the benefits of it when paid." Cummins Diesel Sales of Colorado Co. v. United States (D.C.Colo.1967) 263 F. Supp. 677, 683. See also, Kimbrell v. C. I. R. (5th Cir.1967) 371 F.2d 897; Trust Company of Georgia v. Ross (5th Cir.1967) 392 F.2d 694, cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101; Friedman v. C. I. R. (6th Cir.1965) 346 F.2d 506. In Blassie v. C. I. R., *supra* 394 F.2d 628, a union agent, who arranged to be qualified as a broker, in order to avoid commission charges, turned over all of his commission earnings to a benevolent society and union welfare fund. The Eighth Circuit found that the agent had realized taxable income, stating, at pp. 630–631 of 394 F.2d:

"The legal incidents of taxability * * * must hinge on the taxpayer's right to receive the insurance commissions and power of disposition over them notwithstanding his agreement to transfer their economic enjoyment to another."

The foregoing cases are typical of those which have followed the leading case of Helvering v. Horst, decided by the Supreme Court in 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75. In *Horst* a father detached interest coupons from negotiable bonds, shortly before their due date, and delivered them as a gift to his son, who later collected the interest at maturity. In ruling that the father realized taxable income, the Supreme Court found that income may be "realized" by reason of factors other than actual receipt of payment, stating at p. 117, 311 U.S., at p. 147, 61 S.Ct., at pp. 78–79, 85 L.Ed.:

"Although the doner here, by the transfer of the coupons, has precluded any possibility of his collecting them himself, he has nevertheless, by his act, procured payment of the interest, as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such non-material satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. Even though he never receives the money he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named. * * *"

In looking at the substance of the transactions here involved, the Court must conclude that the facts of this case come squarely within the ruling of Helvering v. Horst. On May 25, 1964, upon the written election of Charles Lee Becker to buy all of the stock held by the majority group, and his subsequent deposit of earnest money, Rollins in effect sold all of his stock to Charles Lee Becker. From that time, while Rollins owned the legal right to receive the proceeds of that sales agreement, he lacked the legal right and power to transfer title to the shares themselves. While counsel for

Rollins insists upon the contingent nature of Rollins' right to receive income in that Charles Lee Becker had merely an *option* to purchase shares, which could be defeated by his failure to pay full purchase price on October 1, 1964, the Court finds that the language of the Agreement of May 25, 1964, simply does not support such a construction. In addition, at the time the gifts of stock were actually made by Rollins, he knew, for a fact, that Becker had been successful in financing the sale and that the sale would be closed on June 29, 1964. See Trust Company of Georgia v. Ross, *supra*, 392 F.2d 694, and *cf.* Jacobs v. United States (S.D.Ohio 1966) 280 F. Supp. 437, aff'd 390 F.2d 877, where Court found taxpayer's right to receive income was defeasible.

The Court concludes that the substance of the transactions here involved establish that the act of Rollins in transferring the 3,000 shares of stock to the charitable institutions did not operate for the purpose of shifting the tax consequences of his agreement with Charles Lee Becker. What Rollins gave to charity was, in effect, the income realized from the sale of stock to Becker, and he is liable for all taxable gain arising from that sale. Accordingly, the Court hereby enters the following Conclusions of Law:

1. The Court has jurisdiction of this action under 28 U.S.C. §§ 1346(a) (1) and 1402(a) (2).

2. Section 61(a) (3) of the Internal Revenue Code of 1954 provides that gross income includes gains from dealings in property.

3. Upon the election of Charles L. Becker, in writing, at 5:48 p.m. on May 25, 1964, to "buy" under the contract of the same date, Willard W. Rollins and his wife, the taxpayers, sold all of their shares of stock in Handy-Andy, Inc., to Charles L. Becker for $35.00 per share.

4. The substance of the transaction whereby Rollins caused 3,000 shares of Class B stock of Handy-Andy, Inc., to be transferred, on June 29, 1964, to Mexican Baptist Bible Institute and Mary Hardin-Baylor College, was the donation of the proceeds from the sale of such stocks, and not the donation of the stocks themselves.

5. The Court finds that Willard W. Rollins and his wife, Lillian, realized the income from the sale of the 3,000 shares of stock of Handy-Andy, Inc., in the amount of $105,000, and that they are subject to federal income taxes for the year 1964 on capital gains in the sum of $74,000.00.

In accordance with Rule 52 Fed.R.Civ. Proc. the foregoing shall constitute the findings of fact and conclusions of law of this Court. Accordingly,

It is ordered that the Clerk enter judgment in accordance with such findings and conclusions, denying all relief to plaintiffs, under the provisions of Rule 58 Fed.R.Civ.Proc.