S. C. JOHNSON & SON, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1821–72.　　Filed March 31, 1975.

*Karl R. Price,* for the petitioner.
*James F. Kidd* and *Denis J. Conlon,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE | Deficiency |
| --- | --- |
| June 30, 1967 | $2,037,317.76 |
| June 28, 1968 | 2,768,400.26 |

Other issues having been settled, the only issue remaining for decision is whether petitioner realized unreported income in the amount of $555,427.50 from the contribution of two foreign exchange contracts to a charitable organization and the subsequent sale of those contracts by the charitable organization and, if so, whether the income realized on the sale of the contracts is taxable as ordinary gain or as capital gain.

### FINDINGS OF FACT

Petitioner S. C. Johnson & Son, Inc., is a Wisconsin corporation engaged in the manufacture and sale of various wax products and other chemical specialties. Its manufacturing plants, as well as its principal offices, are located in Racine, Wisc. In reporting its income, petitioner uses a fiscal year ending on the Friday nearest June 30.

During its fiscal year 1968, petitioner had 27 foreign subsidiaries which were engaged in the manufacture and sale or the purchase and sale abroad of products similar to the ones petitioner manufactured and sold in the United States. Most of the subsidiaries were wholly owned, directly or indirectly, by petitioner. Petitioner did not make sales in any substantial amounts to its foreign subsidiaries, but it provided them with technical assistance and the use of certain intangibles for which it received service fees and royalties, paid monthly or quarterly.

One of petitioner's wholly owned subsidiaries in 1968 was S. C. Johnson & Son, Ltd. (presently named Johnson Wax Ltd.), a British corporation, which was engaged in the manufacture and sale of wax products and chemical specialties in the United Kingdom. Johnson Wax Ltd. was one of petitioner's largest and most profitable subsidiaries. At the end of its fiscal year 1967 (June 30), the subsidiary had net assets with a British currency equivalent of about $2,600,000.

In July 1967, petitioner's management became concerned over the possibility that the British pound sterling would be devalued. Such a devaluation would reduce the value of Johnson Wax Ltd.'s assets in terms of United States dollars, as reflected on petitioner's consolidated financial statements. Petitioner itself carried no sterling balances and owned no other British assets.

One of the measures considered by petitioner's management to protect against the effects of possible devaluation of the British pound sterling was a forward sale of pounds, i.e., a contract to sell pounds on a designated future date at an agreed price. Since the seller can meet its obligation under such a contract by buying pounds at any time between the date of the contract and 2 days prior to its maturity, petitioner's management reasoned that petitioner could make a profit from a forward sale and thereby offset whatever loss was caused by the devaluation. Petitioner's management had not previously handled such forward sales. It was aware, however, that the foreign exchange departments of the major metropolitan banks, acting as dealers, frequently buy and sell foreign currencies for both immediate and future deliveries and that price quotations were published in the daily press.

Petitioner decided to make a forward sale of British pounds. Accordingly, on July 26, 1967, it entered into contracts (hereinafter the contracts) with two New York City banks, one with

First National City Bank and the other with Morgan Guaranty Trust Co. Under each contract, petitioner agreed to sell and the bank agreed to buy 750,000 British pounds at $2.765 each, for delivery on July 29, 1968. Each bank sent petitioner a written confirmation of the terms of the contract on a standard form used by the bank, a duplicate copy of which petitioner executed and returned to the bank.

The contract with the First National City Bank recited:

We confirm having today BOUGHT from you the foreign exchange described hereunder, subject to the conditions set forth on the reverse side hereof.

| | | | |
|---|---|---|---|
| Amount _____ | £750,000-0-0 | Tenor_____ | Cable London |
| Delivery_____ | July 29, 1968 | Rate_____ | 2.7650 |

The reverse side set forth the following conditions:

I. Should the New York market price of the foreign exchange be more at any time than the rate we are to pay you therefor, you shall, upon our request at any time, promptly deposit with us at this office, as security for your obligation, cash or its equivalent in an amount sufficient to cover the amount of the increase. In default thereof, we may, in our discretion at any time thereafter, cancel the purchase, whereupon you will be indebted to us for, and shall pay us upon demand, an amount equal to any excess of the said market price of such foreign exchange on the date of cancellation over the purchase price.

II. Unless the purchase is cancelled as provided above, the foreign exchange shall be delivered by you in free and unrestricted funds, and in the manner indicated on the reverse side hereof. If delivery is to be made by a MAIL or CABLE TRANSFER, delivery shall be made to such one of our foreign Branches or Correspondents, for credit to our account, as shall have been specified to you by us and confirmed in writing; if by a CABLE TRANSFER, such delivery shall be made not later than the due date specified on the reverse side hereof; if by a MAIL TRANSFER, by delivery to us not later than the date specified on the reverse side hereof of a copy of your order instructing the transfer, and delivery must be effected pursuant thereto in due course; if by a CHECK or DRAFT, by delivery to us not later than the date specified on the reverse side hereof of such an item payable in a country where the foreign exchange is the usual medium of exchange and it must be accepted or paid (as the case may be) on presentation.

III. In event of any of the conditions set forth in "II" hereof not being fulfilled, you will, upon demand at any time thereafter, pay us: (a) any United States Dollar amount which we may have paid you on account of the foreign exchange, together with interest thereon at such rate as we may determine to be effective at the time in the aforesaid country for loans or advances to us of the foreign currency, and for the period between the time when such payment was made by us to you and the date when such reimbursement shall have been received by us from you, and (b) any excess of the United States Dollar equivalent of the amount of the foreign exchange (at our selling rate for cable transfers of such foreign exchange on the date of reimbursement) over the

purchase price. Should the foreign exchange for which we shall have been thus reimbursed, and/or any relative documents (or the proceeds thereof), be at the time of such reimbursement or thereafter in the possession of our Branch, Correspondent or otherwise under our control, the same will be held for your account without responsibility therefor on the part of this Bank or its Correspondent.

IV. As security for the prompt payment of any indebtedness or liability for which you may be or become obligated hereunder, we shall have a lien upon any and all of your funds and/or other property which is (are) now or may at any time(s) hereafter come into our possession or under our control.

In November 1967, the British Government devalued the pound, reducing its par value from $2.80 to $2.40. In the months immediately preceding the devaluation, the pound had traded, in spot transactions, between $2.78 and $2.80; in the months immediately following, it traded between $2.38 and $2.42. The rates on forward transactions ranged from 0.5 cent to 4 cents under the spot rate.[1]

The owner of a forward sale contract with respect to a foreign currency can close out his position, in an economic sense, at any time by making a forward purchase of an equivalent amount of the same currency for delivery on the same maturity date. The sale contract can then be performed at maturity by delivering the funds acquired under the purchase contract. Alternatively, the owner can achieve the same basic objective by selling the contract to a third party, although to make the sale without recourse, he must obtain the consent of the bank (i.e., the bank's approval of the purchaser under the forward sale contract). On the other hand, if he wishes to maintain his forward position as long as possible, he may perform at maturity by purchasing the currency on the spot market at any time until 2 banking days in advance of the maturity date.

After the November 1967 devaluation, petitioner's contracts had substantial value. Petitioner's management gave considerable attention to the question of what should be done with the contracts.

In 1959, petitioner had organized a Wisconsin nonprofit corporation, the Johnson's Wax Fund, Inc. (hereinafter the Wax Fund), which was ruled by the Internal Revenue Service to be

---

[1] In 1971, the United States devalued the dollar, and the rates on the pound rose, exceeding $2.60 in February 1972, and continuing within 2 cents of that amount through May 1972. Beginning in June 1972, the pound was allowed to float, and the rates in the next 12 months fluctuated between $2.34 and $2.58.

exempt from Federal income tax under section 501(c)(3), I.R.C. 1954. Under the direction of a board of seven trustees, all officers or employees of petitioner, the Wax Fund had operated programs for awarding college scholarships and providing support for public charities, schools, universities, and hospitals. To provide the moneys required for these programs, petitioner has made annual charitable contributions to the Wax Fund approximating the maximum amount deductible for Federal income tax purposes. Since 1961 about half of the annual donations have been in the form of cash.

Early in 1968, Edward J. Graham (hereinafter Graham), petitioner's assistant treasurer, proposed that the contracts be donated to the Wax Fund in kind. Graham reasoned that the donation of the contracts would cover most of petitioner's obligation to the Wax Fund, would permit the Wax Fund to obtain cash by selling or performing on the contracts at whatever time it chose to do so, and would permit petitioner to avoid income tax on the gain which it would realize on its sale or performance of the contracts.

Graham's proposal was approved by petitioner's board of directors. Accordingly, two instruments, each dated April 5, 1968, were executed on behalf of petitioner and, on that date, delivered to Harold C. Mason (hereinafter Mason), the treasurer of the Wax Fund. Each instrument identified one of the two contracts and contained the following paragraph:

S. C. Johnson & Son, Inc. by execution of this Assignment does hereby transfer and assign all its right, title, and interest in such contract to The Johnson's Wax Fund, Inc. and The Wax Fund assumes and agrees to perform all S. C. Johnson & Son, Inc.'s obligations under the agreement.

Prior to the execution of these instruments, Graham and Mason both checked by telephone with the two New York banks which were parties to the contracts, and both banks agreed to the assignments. On April 8, 1968, Graham mailed a copy of the appropriate assignment to each bank, and each assignment was returned with the bank's approval without recourse, one on April 16, 1968, and the other on April 25, 1968.

Late in April 1968, Mason told Loren Catlin (hereinafter Catlin), a representative of Donaldson, Lufkin & Jenrette, Inc. (sometimes hereinafter the Donaldson firm), a New York financial firm which gave advice to petitioner's deferred profit-sharing trust, of the two contracts. A few days later, the

Donaldson firm offered to purchase the two contracts for an aggregate consideration of $559,177.50. After consulting with the other trustees of the Wax Fund, Mason telephoned the Donaldson firm and accepted the offer. On May 2, 1968, Mason mailed the contracts to the Donaldson firm, together with formal assignments thereof, executed on behalf of, and in the name of, the Wax Fund. On May 16, 1968, the Wax Fund received the Donaldson firm's check in the amount of $559,177.50 payable to the Wax Fund. The proceeds of the check were deposited in the Wax Fund's treasury and used for its charitable purposes.

The minutes of the May 2, 1968, meeting of the Wax Fund's trustees reflect the following:

> Mr. Mason reported that on April 5, 1968, S. C. Johnson & Son, Inc., had made a contribution to the Wax Fund in the form of two hedge contracts which had sold the British £ forward and which had acquired substantial value due to the devaluation of the £ last November.
>
> The Wax Fund sold these contracts as of April 29, 1968, to Donaldson, Lufkin & Jenrette, Inc., of New York City for a total of $559,177.50. Actual payment will be received by the Wax Fund soon and this contribution from S. C. Johnson & Son, Inc.'s 1967/68 fiscal year will be invested in the usual manner on a short-term basis.

Morgan Guaranty Trust Co. charged petitioner a fee of $3,750 for petitioner's assignment of the Morgan Guaranty contract to the Wax Fund, which petitioner paid. The bank also charged the Wax Fund a fee in the same amount for the Wax Fund's assignment of the contract to the Donaldson firm, which the Wax Fund paid. Petitioner did not receive any consideration for either one of the assignments, directly or indirectly.

On its Federal income tax return for the fiscal year ended June 28, 1968, petitioner claimed a charitable contribution in an amount equal to the value, $559,177.50, of the two contracts as of the date of the contribution, and the deduction has not been challenged by the Internal Revenue Service.[2] In the notice of deficiency, respondent determined that petitioner realized unreported taxable income in the amount of $555,427.50 during the taxable year ended June 28, 1968, from the disposition of the two contracts.

---

[2] All the taxable years in issue precede the effective date of the amendment to sec. 170(e), I.R.C. 1954, which places certain limits on deductions for contributions of property to charitable organizations. See the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 549.

OPINION

Under the terms of the two July 26, 1967, forward sales contracts, petitioner was obligated to deliver and sell 750,000 British pounds to each bank 1 year later, on July 29, 1968, and the banks agreed to pay petitioner at a rate of $2.7650 per pound for the pounds so delivered. As a result of the devaluation of the British pound, the contracts had appreciated in value in that the forward sales could be covered by the purchase of British pounds at a rate lower than the rate receivable upon completion of the sales on July 29, 1968.

Based upon this appreciation in value prior to the assignment of the contracts to the Wax Fund, respondent urges that the gain from the contracts was "in the bag"; only a telephone call was necessary to close the contracts and realize the potential income. Respondent argues further that since realization of the income was "reasonably probable," it was "earned" before the gift was made, and petitioner could not escape taxation on that income by transferring the contracts to the Wax Fund; in short, the assignment of the contracts was no more than an assignment of "earned" income. Clearly, respondent points out, a taxpayer cannot divest himself of income previously earned by a gift of the property which produced the income, citing *Smith's Estate v. Commissioner*, 292 F.2d 478 (C.A. 3, 1961), affirming 34 T.C. 842 (1960); *Hudspeth v. United States*, 471 F.2d 275 (C.A. 8, 1972); *Kinsey v. Commissioner*, 477 F.2d 1058 (C.A. 2, 1973), affirming 58 T.C. 259 (1972); *Estate of Bertha May Holmes*, 1 T.C. 508 (1943); *S. M. Friedman*, 41 T.C. 428 (1963), affd. 346 F.2d 506 (C.A. 6, 1965); *Bolling Jones, Jr.*, 39 T.C. 404 (1962).

Respondent does not deny, however, that the contracts were property for income tax purposes, *International Flavors & Fragrances Inc.*, 62 T.C. 232, 238-239 (1974); *Meyer J. Stavisky*, 34 T.C. 140, 142–143 (1960), affd. 291 F.2d 48 (C.A. 2, 1961), or that a gift of appreciated property alone does not result in income to the donor upon subsequent disposition by the donee, *Humacid Co.*, 42 T.C. 894, 913 (1964) (involving promissory notes); *Campbell v. Prothro*, 209 F.2d 331 (C.A. 5, 1954) (calves to be selected from the taxpayer's herd); *Stuart A. Rogers*, 38 T.C. 785 (1962) (a $10,000 equity in standing timber); *Sheppard v. United States*, 176 Ct. Cl. 244, 361 F.2d 972 (1966) (a fractional interest in a racehorse); *Carrington v. Commissioner*, 476 F.2d

704, 708 (C.A. 5, 1973), affirming a Memorandum Opinion of this Court; *Winton v. Kelm*, 122 F. Supp. 649 (D.Minn. 1954); *Apt v. Birmingham*, 89 F. Supp. 361 (N.D. Iowa 1950); *Daniel D. Palmer*, 62 T.C. 684 (1974), on appeal (C.A. 8, Nov. 22, 1974) (stock in corporations which were liquidated shortly afterward). Relying upon these principles, petitioner maintains that the assignment of the contracts was no more than a gift of appreciated property, which shifted the incidence of taxation to the donee, in this case the Wax Fund. Petitioner further contends that a right to income attached to transferred property is not "earned" unless it has crystallized and become vested prior to the gift, and that no such right to income existed at the time of the assignment of the contracts. We agree and hold for petitioner.

As a matter of law, there is no merit in respondent's contention that the transfer of the contracts to the Wax Fund was an assignment of "earned" income on the ground that, at the time the assignment was made, there was a "reasonable probability" that the income would be paid to petitioner.[3] There is nearly always a "reasonable probability" that income will be derived from a gift of appreciated property to a charitable organization. This was true of the collection of the promissory notes in *Humacid Co., supra,* the sale of the calves in *Campbell v. Prothro, supra,* the cutting of the timber in *Stuart A. Rogers, supra,* and the disposition of the interest in the racehorse in *Sheppard v. United States, supra.* Indeed, the only way in which the charitable purpose could have been accomplished in each of those cases was to convert the appreciated property to cash. That such a conversion occurred after the gift was made did not mean that the taxpayer assigned income which had already been earned. See also *Grove v. Commissioner*, 490 F.2d 241 (C.A. 2, 1973), affirming a Memorandum Opinion of this Court; *Behrend v. United States,* an unreported case (C.A. 4, 1972, 31 AFTR 2d 73–406, 73–1 USTC par. 9123); *DeWitt v. United States*, 204 Ct. Cl. 274 (1974). These precedents clearly support petitioner's assertion

[3] Respondent's reliance upon *Bolling Jones, Jr.,* 39 T.C. 404 (1962); *S. M. Friedman,* 41 T.C. 428 (1963), affd. 346 F.2d 506 (C.A. 6, 1965); and *Commissioner v. Phillips,* 275 F.2d 33 (C.A. 4, 1960), reversing 30 T.C. 866 (1958), is misplaced. Those cases involved endowment or annuity contracts which were assigned to a charitable corporation before interest income had accrued in the accounting sense but after the taxpayer had acquired a right to receive payment thereof. The courts held the taxpayer did not avoid taxation of the income by the assignment of the contracts. The maturity or "ripeness" of the "accrued" economic gain coupled with the fact that the gain was essentially equivalent to earned interest income explain those decisions.

that gain derived from property is not "earned" until an event has occurred with respect to that property which creates a right to the income.

Where the taxpayer has already disposed of the appreciated property and is entitled only to its proceeds, or where his rights to its proceeds have so "matured" or "ripened" that he has a right to the gain, he is taxable thereon even though he purports to transfer the property to someone else. Thus, in *Rollins v. United States*, 302 F. Supp. 812 (W.D. Tex. 1969), the court held that the donor was taxable on the proceeds of a sale by the donee of gifted property because the contract of sale was executed before the gift. In *Harold N. Sheldon*, 62 T.C. 96 (1974), the taxpayer transferred baled cotton to a cooperative which placed it in a marketing pool. The taxpayer merely made a gift of the right to receive the sales proceeds from the cooperative, and this Court held that the transfer did not relieve the taxpayer of taxation on the proceeds. Finally, the donor in *Smith's Estate v. Commissioner, supra,* was held liable for the tax on a dividend where the dividend was declared before a gift of the stock was made. See also *Estate of Bertha May Holmes, supra.* The mere anticipation or expectation of income, however, no matter how well founded, is insufficient to cause the donor to incur liability for a tax on such income. *Daniel D. Palmer, supra* at 695; *Behrend v. United States,* 31 AFTR 2d at 73–408, 73–1 USTC par. 9123.

We think that the facts of this case demonstrate that a fixed right to the income from the forward contracts did not exist at the time they were assigned to the Wax Fund.

First, in a legal sense, petitioner had no right to any gain whatever under the contracts until the pounds were delivered to the banks on July 29, 1968.[4] Prior to such delivery, petitioner certainly expected to realize a gain on closing the contracts. But unless and until the pounds were delivered, petitioner had no right to any income. Indeed, had petitioner failed to deliver the pounds on time, the banks would have been relieved of their obligations under the contracts and petitioner would have realized nothing.

---

[4] Indeed, sec. 1.1233–1(a)(1), Income Tax Regs., declares that: "For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale." See *Frank C. LaGrange,* 26 T.C. 191, 197 (1956).

Second, our Findings explain that petitioner could have closed out its forward position in an economic sense after the devaluation and assured eventual realization of gain under one of three methods: (1) By making a forward purchase of an equivalent amount of the same currency for delivery on July 29, 1968, the maturity date of the two contracts; this purchase would have offset petitioner's July 26, 1967, sale, and would have entitled petitioner on July 29, 1968, to the gain represented by the difference between the exchange rate stated in the contracts and the exchange rate prevailing on the forward purchase date; (2) by purchasing the currency on the spot market any time up to 2 days in advance of the maturity date and performing the contracts at maturity; petitioner's gain would have been measured by the difference between the exchange rate specified in the contracts and the rate prevailing on the date of the purchase;[5] or (3) by selling the contracts to third parties, the consent of the respective banks being required for the sale to be without recourse.[6]

On April 5, 1968, when the contracts were assigned to the Wax Fund, petitioner had taken none of these steps (or any other steps)[7] to close out its forward position under the sales contracts. It did not own the pounds necessary to close the contracts, nor had a forward purchase been made.[8] Prior to the maturity date, a revaluation of the pound or the dollar could have erased or lessened the potential gain, or even caused losses. Thus, the amount of the gain, if any, was not assured and was most certainly not "in the bag" as asserted by respondent. At the time

---

[5] In *Wool Distributing Corp.*, 34 T.C. 323, 328 fn. 1 (1960), this Court said:

"A short sale of foreign currency obligates the seller to deliver a fixed amount of the foreign currency, at a specified date in the future, at a specified rate of exchange. On the date of delivery, or before, the seller may 'cover' by buying the fixed amount of currency at the *then* current rate of exchange. The gain or loss to the seller is determined by comparing the rate at which he agreed to sell with the rate of exchange on the date of 'cover.'"

[6] Cf. *Frank C. LaGrange, supra,* where the taxpayer claimed to have sold two forward sale contracts and thereby realized long-term capital gain, but the Court held that the purported sale to his brokerage firm was not a bona fide sale but was an arrangement for the brokerage firm, acting on behalf of the taxpayer, to cover the forward sales. The taxpayer was held to have realized short-term capital gain because the pounds acquired to cover the sale had been held less than 6 months.

[7] Conceivably, for example, petitioner might have negotiated cancellations of the two contracts with the New York banks for an agreed consideration, but it had not taken any steps in that direction.

[8] The issue as to whether a taxpayer who makes arrangements to cover a forward sale and then assigns only the forward sales contract realizes gain is not here presented, and we express no view on that question. We hold only that petitioner had done nothing to lock in the potential gain at the time of the assignment.

of the assignment, petitioner simply had no fixed right to any assignable income in either a legal or an economic sense.

After the assignment, the Wax Fund possessed the same alternatives available to petitioner and could thus control the timing of the receipt of the income or by its inaction preclude its receipt. In addition, if it chose to hold the contracts until maturity, the Wax Fund assumed the risk of possible liabilities, specified in the contract quoted in our Findings, should revaluation of the pound or the dollar occur between the time of the assignment and the maturity date. These powers and possible liabilities with respect to the contracts are further cogent evidence that there was no fixed right to income at the time of the gift.

Respondent next argues that petitioner did not make a completed transfer of the contracts but actually sold them and assigned the proceeds to the Wax Fund. This argument is not supported by the evidence. The record is unmistakably clear that, prior to April 5, 1968, petitioner had done nothing to cover or dispose of the contracts. On that date petitioner executed two documents, each headed "Assignment," reciting that petitioner does "transfer and assign all its right, title, and interest" in the contract described therein to the Wax Fund and stating further that: "The Wax Fund assumes and agrees to perform all S. C. Johnson & Son, Inc.'s obligations under the agreement." The agreements were sent to the respective banks on April 8, 1968. The banks approved and returned the assignments of the contracts on April 16, 1968, and April 25, 1968, respectively. Not until those dates was petitioner released from its obligations. Cf. *Frank C. LaGrange*, 26 T.C. 191, 197 (1956).

After the assignments to the Wax Fund had been completed, Mason as treasurer of the Wax Fund began making inquiries about disposing of the contracts. His testimony is unequivocal that: "We had done nothing earlier." In late April 1968, he met with Loren Catlin, the representative of the Donaldson firm, told him of the Wax Fund's plan to dispose of the contracts, and asked if a buyer could be located. A few days later, Catlin called and said that a buyer had been located. On May 2, 1968, Mason transmitted written assignments of the contracts to the Donaldson firm with a letter stating that the price of each assignment was $279,588.75, or a total of $559,177.50. The assignments were subsequently approved by the banks. Two

vouchers, in the amount of $279,588.75 each, were issued by the Donaldson firm reflecting a settlement date of May 9, 1968.

The record is thus abundantly clear that petitioner's assignment of the two contracts to the Wax Fund had been completed before the negotiations for the sale of those contracts were undertaken. Cf. *Cumberland Public Service Co. v. United States*, 338 U.S. 451 (1950). It is true that petitioner's officers, who were also trustees of the Wax Fund, no doubt planned to sell or cover the contracts in some way prior to the assignment. But in practically all of the cases cited above, whether they involved promissory notes (*Humacid Co., supra*), calves (*Campbell v. Prothro, supra*), an equity in standing timber (*Stuart A. Rogers, supra*), a fractional interest in a racehorse (*Sheppard v. United States, supra*), or stock in a closely held corporation (e.g., *Carrington v. Commissioner, supra*), it was anticipated that the gifted property would be sold or otherwise liquidated. Only through such a step could the purpose of the charitable contribution be achieved.

Nor do we think it aids respondent's cause to emphasize that petitioner's officers controlled the Wax Fund. The two organizations were separate legal entities. Respondent had recognized their separateness by ruling that the Wax Fund was exempt from Federal income taxes under section 501(c)(3) of the Internal Revenue Code of 1954. Under the laws of Wisconsin, the trustees had legal obligations as fiduciaries to protect the interests of the Wax Fund. There is no evidence that there was overreaching or any failure to protect the interests of either party—to the same extent as if the officials of the two organizations had been complete strangers. In *Daniel D. Palmer,* 62 T.C. at 693–694, this Court recently answered a similar argument by respondent as follows:

It is true that the petitioner controlled the foundation. However, the foundation was a charitable organization that was organized for certain specific purposes. Under Iowa law, the petitioner was subject to the responsibilities and duties of a fiduciary when he acted as director and trustee of the foundation * * * and there is nothing in the record to indicate that he exercised command over the use and enjoyment of property of the foundation in violation of his fiduciary duty. There has been no allegation or evidence that the foundation was a sham. In these circumstances, it appears clear that the foundation was not an alter ego of the petitioner, and in fact it had dominion and control over the shares of stock received by gift from the petitioner, notwithstanding the fact that the petitioner was the controlling trustee * * *

See *Behrend v. United States,* an unreported case (C.A. 4, 1972, 31 AFTR 2d 73–406, 73–1 USTC par. 9123).

We hold petitioner did not realize taxable income when the forward sale contracts were contributed to the Wax Fund [9] or when the Wax Fund disposed of the contracts.

*Decision will be entered under Rule 155.*

---

[9] In view of this conclusion, we need not decide whether the income alleged to have been received would have been taxable as ordinary income or capital gain.